UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/22/2025
```

------------------------------------------------------------------X
                            :
                            :
                            :

In re:                       :

                       :           25-cv-1312 (LJL)

ELETSON HOLDINGS INC., et al.,    :           25-cv-1685 (LJL)

                       :           25-cv-2897 (LJL)

          *Debtors.*         :           25-cv-2824 (LJL)

                       :           25-cv-2811 (LJL)

                       :

                       :        <u>OPINION AND ORDER</u>

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        This Opinion and Order resolves several motions pending before the Court. Reed Smith LLP and an entity identifying itself as "Provisional Holdings Inc." ("Provisional Holdings") appeal from the January 29, 2025, Order in Support of Confirmation and Consummation of the Court-Approved Plan of Reorganization of the United States Bankruptcy Court for the Southern District of New York (the "Consummation Order") and the Bankruptcy Court's January 24 Oral Decision incorporated therein (the "Jan. 24 Oral Decision"). No. 25-cv-1312, Dkt. No. 1. Lassia Investment Company, Glafkos Trust Company, and Family Unit Trust Company (together the "Former Majority Shareholders") appeal from that same Order. No. 25-cv-1685, Dkt. No. 1. Provisional Holdings appeals also each and every part of the March 13, 2025 Order of the United States Bankruptcy Court for the Southern District of New York and the court's March 12, 2025 Oral Decision incorporated therein (the "March 2025 Order"). No. 25-cv-2824, Dkt. No. 1. The Former Majority Shareholders appeal from the March 2025 Order as well. No. 25-cv-2897, Dkt.

No. 1.  Appellee Eletson Holdings Inc. ("Holdings")[1] has moved to dismiss the appeals filed by

Provisional Holdings and the Former Majority Shareholders in three of the appeals.  *See* No. 25-

cv-1312, Dkt. No. 5; No. 25-cv-1685, Dkt. No. 7; and No. 25-cv-2824, Dkt. No. 24.  Holdings

has moved to dismiss the appeals in its responsive briefing in No. 25-cv-2824, Dkt. No. 28, and

No. 25-cv-2897, Dkt. No. 11.

For the reasons that follow, Holdings' motions to dismiss are GRANTED, and the appeal

in 25-cv-2897 is DISMISSED.

## BACKGROUND

Familiarity with the prior proceedings in this matter is presumed.[2]

### A.    The Confirmation Order

These appeals arise from the petition of Holdings for protection under Chapter 11 of the

United States Bankruptcy Code.  In March 2023, three creditors of Eletson (the "Petitioning

Creditors") commenced involuntary bankruptcy proceedings against the company and two

affiliates (Eletson Finance (US) LLC and Agathononissos Finance LLC) (the "Debtors").  See *In*

---

[1] In order to distinguish Eletson Holdings post-bankruptcy reorganization, at times the Bankruptcy Court and the parties have referenced it as "Reorganized Holdings."  Where that term is used in quoted language in this opinion, it refers to Eletson Holdings Inc., or "Holdings".
[2] Much of the prior context and proceedings arise from a closely related action between Holdings and Levona to confirm or to vacate an arbitration award made in an arbitration between the entities.  *See* No. 23-cv-7331.  That dispute arose "from a dispute over the ownership of the preferred shares in the Company, and thereby the control over the Company's decision making and assets."  *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 546 (S.D.N.Y. 2024).  Holdings historically has "owned a large fleet of medium and long-range product tankers and has been a leader in the transportation of oil products and gas cargoes."  *Id.*  Holdings entered into a series of agreements that transferred ownership of its preferred shares to Levona.  One of those agreements contained a Purchase Option whereby the original owners could buy back the preferred shares upon meeting certain contractual provisions.  *Id.*  In an arbitration to determine the parties' rights under the contract, the arbitrator determined that Holdings had exercised the Purchase Option, and that therefore Levona no longer owned the preferred shares.  *Id.* at 562.

*re Eletson Holdings Inc. et al.* ("Bankruptcy Proceeding"), No. 23-10322 (Bankr. S.D.N.Y.).[3]

One of those creditors was Pach Shemen LLC ("Pach Shemen"), which, in 2023, had purchased

$183,851,546 of Holdings bonds for $2,000,000.  *See Eletson Holdings*, 731 F. Supp. 3d at 554.[4]

On September 25, 2023, on motion of the Debtors, the proceeding was converted to a voluntary

bankruptcy under Chapter 11.  Bankr. Dkt. No. 215.  During the Chapter 11 proceedings, the

board of directors of Eletson consisted of: Vassilis Hadjieleftheriadis, Konstantinos

Hadjieleftheriadis, Ioannis Zilakos, Emmanuel Andreoulakis, Vassilis Kertsikoff, Eleni

Giannakopoulou, Panagiotis Konstantaras, and Laskarina Karastamati.  Bankr. Dkt. No. 1405

("Jan. 24 Oral Decision") at 22:9–14.  Three of those individuals and their families are

particularly important to the present appeals, as they controlled the three majority shareholders of

Holdings.  The family of Laskarina Karastamati controlled Lassia Investment Company

("Lassia"); the family of Vassilis Kertsikoff controlled Family Unity Trust Company ("Family

Unity"); and the family of Vassilis Hadjieleftheriadis controlled Glafkos Trust Company

("Glafkos").  Jan. 24 Oral Decision at 23:12–15; *see* Bankr. Dkt. No. 1021 ¶ 25.  The three are

cousins.  Bankr. Dkt. 1603 at 161, 163.  Each of the Former Majority Shareholders held a 30.7%

interest in Holdings, and each was organized under the laws of Liberia.  *Id.*  The minority

shareholders of Holdings were Elafonissos Shipping Corp. and Keros Shipping Corp (the

"Former Minority Shareholders," and, together with the Former Majority Shareholders, the

"Shareholders").  Jan. 24 Oral Decision at 22:23–24.

---

[3] In this opinion, "Bankr. Dkt." refers exclusively to the docket of proceeding No. 23-10322.
[4] Pach Shemen is affiliated with Levona, and is a "special purpose entity formed under the laws of the British Virgin islands" engaged by Canadian alternative asset management company Murchison Ltd. to act as its investment sub-advisor.  *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 2024 WL 4100555, at *1 (S.D.N.Y. Sept. 6, 2024).

The Creditors and Debtors submitted competing reorganization plans before the Bankruptcy Court. Under the plan proposed by the Debtors, the Greek families who held a majority interest in Holdings prior to bankruptcy committed to provide funds to the entity in exchange for their continued control of it. *See* Bankr. Dkt. No. 1212 at 27–33. The Creditors, by contract, promised to contribute $53.5 million in cash to Holdings through an offering of equity rights to holders of unsecured claims, which would be backed up by a commitment amount by Pach Shemen of the same value. *Id.* at 39–41.

After lengthy hearings, the Bankruptcy Court found that the plan proposed by the Debtors was unconfirmable and infeasible. The Plan was unconfirmable because it did not contribute new value: (1) the supposed new value contribution was not "new" because it came from "inside the Debtors' capital structure," (2) the contribution was contingent upon a final award in the continuing arbitration proceeding, and (3) there was no adequate proof that the funds committed by the [Majority] Shareholders would "be available over such a long-time horizon." *Id.* at 64–66. Even if the Debtor's plan had been confirmable, it would not have been feasible. The Bankruptcy Court found (1) the $37 million in new shareholder value proposed, even if real, "provides insufficient funding to make all required day 1 payments under the plan," and (2) the Shareholders did not substantiate that they had "sufficient funds" to actually do so. *Id.* at 83–84. The Bankruptcy Court found the Petitioning Creditor's plan confirmable as it "provides sufficient funding to meet all effective date obligations, and because the Petitioning Creditors have escrowed $43.5 [million] in cash to fund the [Plan]." *Id.* at 100.

Thus, on October 25, 2024, the Bankruptcy Court issued a decision overruling the objections of Debtors and the Former Majority Shareholders and confirming the plan of reorganization proposed by Petitioning Creditors, Bankr. Dkt. No. 1132 (the "Confirmation

Plan" or "Plan"). *See* Bankr. Dkt. No. 1212 (the "Confirmation Opinion"). On November 4, 2024, the Bankruptcy Court entered an order setting forth its findings of fact and conclusions of law in support of the Confirmation Plan and setting forth the terms and requirements of the reorganization. *See* Bankr. Dkt. No. 1223 ("Confirmation Order") ("The plan . . . and each of its provisions, including the Modifications, are hereby approved and CONFIRMED under section 1129 of the Bankruptcy Code.").

Several provisions of the Plan and Confirmation Order are critical to understanding these appeals. The Confirmation Plan vested control of Holdings in the Petitioning Creditors rather than in the three Greek families that had previously controlled the company. On the date the Plan was to become effective, "all property in each estate" vested "in Reorganized Holdings, free and clear of all liens, claims, charges or other encumbrances." Confirmation Plan § 5.2(c). Section 5.4 of the Plan provided that all notes and stock and other documents evidencing or giving rise to claims against an interest in debtors were canceled and the obligations of the debtors thereunder or in any way related thereto were released, terminated, extinguished and discharged. *Id.* § 5.4. Section 5.8 gives Reorganized Holdings the authority "to issue or cause to be issued the reorganized equity in accordance with the terms of this plan." *Id.* § 5.8. *See also* 11 U.S.C. § 1141 (effects of confirmation of bankruptcy plan). The members of the governing body of each Debtor prior to the date the Plan went into effect were "deemed to have resigned or otherwise ceased to be a director or manager of the applicable Debtor," Confirmation Plan § 5.10(c), Eletson Holdings was deemed to be Reorganized Holdings, *id.* § 1.126, and the equity of the old Eletson Holdings was vested in its new owners, *id.* § 1.125. Reorganized Holdings was to be managed by a new board consisting of three directors: (i) one director selected by the Plan Proponents, (ii) one selected by the Plan Proponents but subject to the consent of the Creditors'

Committee, and (iii) an independent director selected by the Creditors Committee. *Id.* § 5.10(a), (c). Retention of all professionals by Debtors terminated on the Effective Date. *Id.* § 2.5(a).

The Confirmation Plan and corresponding Confirmation Order also contained many provisions bearing on parties related to the Debtors (the "Related Parties"). The Related Parties were defined to include, among others, the Debtors' "owners" and "current and former . . . equity owners," thus encompassing the Former Majority Shareholders, and the individual owners thereof, including Kertsikoff, Hadjieleftheriadis, and Karastamati. Confirmation Plan § 1.124. The Confirmation Order itself provided in pertinent part:

> The Debtors and the Petitioning Creditors and each of their respective Related Parties are hereby directed to cooperate in good faith to implement and consummate the Plan.

Confirmation Order ¶ 5(i). The Confirmation Order further provided:

> Upon entry of this Confirmation Order, all Holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan or interfering with any distributions and payments contemplated by the Plan.

*Id.* ¶ 12.

The Confirmation Plan became effective on November 19, 2024, (the "Effective Date"), fourteen days after it was entered, when Holdings, now reorganized, waived all conditions precedent. *See* Bankr. Dkt. No. 1258; Jan. 24 Oral Decision at 23:17–18 (statement of the Bankruptcy Court that "[o]n November 19th, 2024, the Chapter 11 plan became effective."). No stay of the Confirmation Order was sought or obtained by any party.[5] Thus, on the Effective

---

[5] On November 7, 2024, a notice of appeal was filed on behalf of Holdings of the Confirmation Opinion, Bankr. Dkt. No. 1233, but no notice of appeal was filed of the Confirmation Order. Perhaps inexplicably, no party sought a stay of the Confirmation Order or filed the bond that would be necessary to obtain a stay. On November 25, 2024, Holdings, now represented by Goulston & Storrs, filed a stipulation and agreement to dismiss the appeal under Rule 8023 of the Federal Rules of Bankruptcy Procedure. No. 24-cv-8672, Dkt. No. 9. The proposed

Date, the board members of the former Debtors were deemed to have resigned, the new board of directors was deemed appointed, the equity interest in the former holders was extinguished, and the equity interest was vested in the new holders. *Id.* at 26:5–27:20.

B.    **Post-Confirmation Events**

Following the Confirmation Order, an entity composed of the Debtors and prior owners of Holdings began representing itself as "Provisional Holdings." So-called Provisional Holdings, as well as the Former Majority Shareholders, undertook a series of actions outside of the United States that the Bankruptcy Court found frustrated the ability of the new owners of Holdings to conduct business as contemplated by the Confirmation Plan.

On November 8, 2024, four members of the eight-member pre-reorganization board of Eletson Holdings resigned. Those were Laskarina Karastamati, Vassilis Kertsikoff, Eleni Karastamati, and Panagiotis Konstantaras. Jan. 24 Oral Decision at 22:19–23. On November 11, 2024, the Former Minority Shareholders of Holdings sought relief from the First Instance Court of Piraeus in Greece to appoint a temporary board to manage the company while the Confirmation Order was being appealed and with the specific mandate, among others, "[t]o obtain judicial protection, namely, on the one hand to support the appeal already filed against the above Bankruptcy Judgment of the United States Bankruptcy Court for the Southern District of New York . . . [and] on the other hand, to appear, with the respective remedies and means provided by law, before the Greek Courts, in order to challenge the Chapter 11 Judgment of

stipulation noted that two of the three appellants had been deemed dissolved as a result of the Confirmation Order, that the representation of the remaining appellant, Holdings, had been terminated by operation of the Confirmation Order, and that Goulston had filed a notice of appearance on behalf of Holdings. *Id.* The Court approved the proposed stipulation after argument on December 30, 2025. Dkt. Nos. 19, 20. Reed Smith, purporting to represent Holdings, filed a notice of appeal to the Second Circuit on January 16, 2025, Dkt. No. 24, and that appeal is still pending. *See In re Eletson Holdings Inc.*, 25-176 (2d Cir.). No stay has been granted regarding the Confirmation Opinion or Confirmation Order.

Voluntary Bankruptcy of [October 25, 2025] to which the Bankruptcy Court of the United States of America was referred for lack of jurisdiction." Bankr. Dkt. No. 1290 at ECF pp. 42 (translation of Greek Court order). *See* Jan. 24 Oral Decision at 22:23–23:2; Bankr. Dkt. No. 1564 ("March 12 Oral Decision") at 16:4–9. The Piraeus Court granted that relief *ex parte* on November 12, 2024, and appointed a provisional board (the "Provisional Board"). Jan. 24 Oral Decision at 22:15–17. Not coincidentally, the purported Provisional Board includes certain of the prior board members of Holdings who resigned, including Vassilis Hadjieleftheriadis, Ioannis Zilakos, Niki Zilakos, Adrianos Psomadis-Karastamatis, Eleni Giannakopoulou, Panos Paxinos, and Emmanuel Andreulaks. *Id.* at 23:4–7. The provisional order of the Piraeus Court was later dismissed by that same court on the basis that post-Bankruptcy Holdings, the appellee in this case, is the entity recognized in the Bankruptcy Proceeding to represent the company. Bankr. Dkt. No. 1721 at 53:3–18; Bankr. Dkt. No. 1687 (Piraeus Court Order of June 6, 2025).

Also relevant are actions taken by the Former Majority Shareholders and the Provisional Board in Liberia, under the laws of which Holdings was organized at the time of the Bankruptcy Proceedings. *See* Bankr. Dkt. No. 1268 at ECF pp. 40–48 (the "Declaration of James Pierre"), ¶ 5. In order for Holding's post-confirmation amended articles of incorporation to have legal effect in Liberia (in other words, for Holdings to have control over the company), the amended corporate governance documents needed to be filed with the Liberian International Ship & Corporate Registry ("LISCR"). Jan. 24 Oral Decision at 10:16–19. The LISCR accepts instruction only from a company's address of record ("AOR"). *Id.* at 10:21–23. The easiest way for the AOR itself to be updated is for the corporation's existing AOR to effectuate the change; in the alternative, a Liberian court can order the LISCR to make the change. *Id.* at 10:25–11:2. Thus, for Holdings to be able to operate as the Plan contemplated and for the creditors to obtain

the value for which they contributed money to the entity, (1) the AOR would have to be updated and (2) amended corporate governance documents would have to be filed with LISCR to reflect the change of control.  In the absence of a change in the corporate governance documents, the new owners of Holdings might possess all of the equity in the new company and governance rights to the company, but that ownership and control would be nominal and illusory, as it would not be reflected in the country where the corporations and its assets were domiciled.

To that end, Holdings petitioned the Bankruptcy Court for an order authorizing Adam Spears, a representative of Holdings, to act as its foreign representative and effectuate those necessary changes.  Bankr. Dkt. No. 1269.  The Bankruptcy Court entered an order to that effect on December 20, 2024.  Bankr. Dkt. No. 1326.[6]  Holdings and Spears could not make that change, however, without cooperation of the former Debtors and shareholders.  When Holdings requested that the Provisional Board, Reed Smith as their counsel, or the Former Majority Shareholders effectuate the update both to the AOR and, subsequently, the LISCR, no relevant party cooperated.  They argued that the requested action would violate Liberian law, and that the Confirmation Order would have to first be recognized in Greece and Liberia before any such change could be made.  Jan. 24 Oral Decision at 12:21–25.  Pach Shemen, one of the Petitioning Creditors, then initiated a proceeding in Liberian court on January 7, 2025, seeking recognition and enforceability of the Confirmation Order in Liberia.  *See* Bankr. Dkt. No. 1459 ECF pp. 300–04 (Pach Shemen petition).  The purported Provisional Board appointed by the Piraeus Court, joined by the Former Majority Shareholders, filed an opposition to Pach Shemen's action on September 1, 2025, arguing that "having made a finding concerning the bad faith actions of

---

[6] The order was amended on March 5, 2025, Bankr. Dkt. No. 1519, and the Former Majority Shareholders appealed that order, Bankr. Dkt. No. 1551.

Murchinson and its affiliates, the U.S. bankruptcy court nevertheless concluded that this conduct was not relevant to the issue of whether the petitioning creditors' plan should be confirmed." March 12 Oral Decision at 77:23–78:4; Bankr. Dkt. No. 1459 ECF pp. 306–07 (Liberian proceedings response).  The Liberian proceeding was eventually dismissed when Holding's domicile was changed to the Republic of the Marshall Islands.  *See* Bankr. Dkt. No. 1603 ECF pp. 4 (certificate that Eletson Holdings is redomiciled from Liberia into the Marshall Islands); *Id.* at 6 (voluntary discontinuance filed by Pach Shemen in Liberian court).

On February 3, 2025, Holdings itself filed an application in the Court of the First Instance of Athens seeking Greek recognition of the Confirmation Order.  Bankr. Dkt. No. 1459 at ECF pp. 349–73.  In response to that proceeding, the Former Minority Shareholders asserted that "the exclusive jurisdiction for the initiation of the insolvency proceedings lies exclusively with the courts of Greece."  March 12 Oral Decision at 65:18–25.  After a hearing on the application, the Athens court declined the request for a *provisional* order recognizing Mr. Spears as Holding's representative in Greece.  Bankr. Dkt. No. 1410 at ECF pp. 6 ¶ 11 (Declaration of Ioannis Markianos-Daniolos).  The Athens case otherwise remains pending.

C.    **The January 2025 Consummation Order**

On November 25, 2024, Holdings filed the Emergency Motion of Reorganized Eletson Holdings Inc. for an "Order Imposing Sanctions on Eletson Holdings' (A) Existing Person of Record and (B) Former Shareholders, Officers, Directors, and Counsel, Including Reed Smith LLP."  Bankr. Dkt. No. 1268.  In brief, Holdings argued that contrary to the obligations of the former officers and directors of Holdings and its majority shareholders and their Related Parties to "cooperate in good faith to implement and consummate the Plan," Confirmation Order ¶ 5(i), those entities failed to update the address of record for Holdings or to amend Holdings' corporate documents in Liberia.

After a one-day trial on January 6, 2025, the Bankruptcy Court issued an Oral Decision on January 24, 2025 and a written order incorporating the Oral Decision, the Consummation Order, on January 29, 2025. Bankr. Dkt. No. 1402 (the "Consummation Order"). In his Oral Decision, Judge Mastando ruled: (1) "the confirmation order and Chapter 11 plan are binding on Reorganized Holdings Inc.'s former shareholders, officers, directors, counsel, nominees and others defined in section 1.124 of the plan pursuant to Section 1141 and 1142 of the Bankruptcy Code"; and (2) "[p]ursuant to section 1142 of the Bankruptcy Code, Reorganized Holdings Inc.'s former shareholders, officers, directors, counsel, and others, as defined in section 1.124 of the plan, are directed to comply with the plan and the confirmation order to assist in effectuating the Chapter 11 plan" and "they are ordered to take all steps reasonably necessary as requested by the board of Reorganized Eletson Holdings Inc. or its agent to assist in amending the AOR and updating the corporate governance documents, including the amended articles of incorporation with LISCR, within seven days of the date of the order to be issued following this ruling." Jan. 24 Oral Decision at 43:9–44:1.

The Consummation Order stated:

1.      Pursuant to section 1142 of the Bankruptcy Code, the Debtors and their Related Parties, including without limitation, the Ordered Parties, are authorized, required, and directed to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof.

2.      The Debtors and the Related Parties, including without limitation, the Ordered Parties, are authorized, required, and directed to take all steps reasonably necessary as requested by Holdings to unconditionally support the effectuation, implementation, and consummation of the Plan, including, but not limited to, by no later than seven (7) days from the date of service of this Order in accordance with applicable law (the "Compliance Deadline"), taking all steps reasonably necessary to update or amend (a) Holdings' AOR to reflect that Adam Spears is Holdings' AOR and (b) Holdings' corporate governance documents on file with LISCR as directed by Holdings.

The Consummation Order provided further that "[i]f the applicable parties do not cause the specific acts set forth in paragraph 2 to occur by the Compliance Deadline or fail to take such actions (or not take such actions) as directed by Holdings in accordance with paragraph 2," then Holdings could request a hearing "on shortened notice . . . to determine whether the applicable parties" were in violation of the order, the Court's Oral Decision, or the Plan or Confirmation Order or Bankruptcy Code. Consummation Order at 4. The Order ran against the "Ordered Parties," which were defined to include the Former Majority Shareholders, Former Minority Shareholders, and Reed Smith (the "Ordered Parties"). *Id.* at 1–2. Reed Smith filed a motion in Bankruptcy Court to stay the Consummation Order, Bankr. Dkt. No. 1412, which was joined by the Former Majority Shareholders, Bankr. Dkt. No. 1414, and was denied by the Bankruptcy Court, Bankr. Dkt. No. 1520. Neither Reed Smith nor the Former Majority Shareholders sought a stay from this Court.

D.    **Subsequent Bankruptcy Court Order**

On February 5, 2025, the compliance deadline for the Consummation Order passed, Holding's AOR was not updated, and its corporate documents were not amended. On February 6, 2025, Holdings filed the Emergency Motion of Eletson Holdings Inc. for Entry of a Further Order in Support of Confirmation and Consummation of the Court-Approved Plan of Reorganization. Bank. Dkt. No. 1416. Holdings moved the Bankruptcy Court to compel the Ordered Parties to update the AOR and to impose sanctions on the Ordered Parties for their failure to do so. *Id.*

On February 20, 2025, the Bankruptcy Court granted that motion. Bankr. Dkt. No. 1468 (the "Feb. 20 Oral Decision"). The Bankruptcy Court found that there was "clear and convincing proof" that the Consummation Order had not been complied with. *Id.* at 103:13–23. The court gave the Ordered Parties a final opportunity for compliance before entering coercive

sanctions by requiring certain of the Ordered Parties to file certifications of compliance by

February 24, 2025.  *Id.* at 105:5–107:12.  Specifically, the Bankruptcy Court required the

noncompliant parties relevant here to do the following:

> One, Reed Smith must certify by Monday, February 24th, at 2 p.m. that it has informed the purported Provisional board, whose members were identified at the January 24th bench ruling, including Mr. Vassilis Hadjieleftheriadis, and the former directors, whose members were identified at the January 24th bench ruling, has informed them that the purported Provisional board, Mr. Hadjieleftheriadis, and the former directors must instruct the AOR, one, to communicate with and take direction from Reorganized Eletson Holdings, two, to update or amend the AOR as directed by Reorganized Holdings, and three, to update or amend Holdings' corporate governance documents on file with LISCR as directed by Holdings.

> [Two,] The purported Provisional board and Mr. Hadjieleftheriadis and the former board members must certify by Monday, February 24th, at 2 p.m. that they have instructed the current AOR, one, to communicate with and take direction from Reorganized Eletson Holdings, two, to update or amend the AOR as directed by Reorganized Holdings, and three, to update or amend Holdings' corporate governance documents on file with LISCR as directed by Holdings.

> . . .

> Four, the majority shareholders must certify by Monday, February 24th, at 2 p.m. that the former majority shareholders have instructed the current AOR, one, to communicate with and take direction from Reorganized Eletson Holdings, two, to update or amend the AOR as directed by Reorganized Holdings, and three, to update or amend Holdings' corporate governance documents on file with LISCR as directed by Holdings.

> Five, by Monday, February 24th, 2025, at 2 p.m., Reed Smith, Sidley Austin[7], the purported Provisional board, Mr. Hadjieleftheriadis, and/or the former majority shareholders must submit under seal to this Court the identity of the AOR, which shall remain under seal until the Court rules on any confidentiality issue related thereto. In addition, the board of Reorganized Eletson Holdings shall keep the identity of the AOR confidential until the Court -- until the Court rules on any confidentiality issue related thereto.

*Id.* at 108:5–110:12.

---

[7] Sidley Austin previously represented the Former Majority Shareholders in the proceedings before the Bankruptcy Court.  They were replaced by counsel at Rolnick Kramer Sadighi LLP on April 21, 2025.  Bankr. Dkt. No. 1616.

Following the Feb. 20 Oral Decision, the Former Majority Shareholders, Reed Smith, Kertsikoff, Hadjieleftheriadis, and Karastamati all filed statements or certifications with the Bankruptcy Court in which they purported to explain why they could not comply with the Bankruptcy Court's orders. *See* Bankr. Dkt. Nos. 1471–75, 1482. As a result of continued noncompliance, the Bankruptcy Court entered sanctions of $1,000 per day on "the purported Provisional Board," Hadjieleftheriadis, the Former Majority Shareholders, and the AOR until they complied. Bankr. Dkt. No. 1495 ¶¶ 1–2 (the "Feb. 27 Sanctions Order").

E.    **The March 2025 Order**

In light of continued noncompliance, on March 13, 2025, the Bankruptcy Court entered an order (incorporating a March 12 Oral Decision) (1) finding the Former Majority Shareholders as well as others (collectively, the "Violating Parties") in contempt for ongoing violations of the Confirmation Order and the Consummation Order; (2) authorizing, requiring, directing and ordering the Violating Parties to withdraw any and all filings that oppose or undermine in any way the judicial recognition of the Confirmation Order, including without limitation filings in the Liberian Proceedings and the Greek Proceedings; (3) enjoining the Violating Parties from making any filings in any court seeking to oppose or undermine in any way the judicial recognition of the Confirmation Order including, without limitation, by initiating or prosecuting any legal actions that seeks to oppose or undermine the Confirmation Order; and (4) imposing coercive monetary sanctions in the amount of $5,000 per part per day against each of the Former Majority Shareholders, each of the Former Minority Shareholders, Provisional Holdings, the Provisional Board, and Vasilis Hadjieleftheriadis. Bankr. Dkt. No. 1537 (the "March 13 Order").

In its Oral Decision predating and incorporated into the March 13 Order, the Bankruptcy Court was clear that sanctions imposed on March 13 were in response to the Violating Parties

failure to "comply with their obligations" under Chapter 11 of the Bankruptcy Code, the Confirmation Plan, the Confirmation Order, and the Consummation Order. *See* March 12 Oral Decision at 73:18–25. Among the obligations the court found to be violated were the instruction that the Former Majority Shareholders cooperate in good faith, that they take reasonable steps to effectuate the Confirmation Plan, and that, consistent with their statutory obligations, they "carry out the plan and . . . comply with any orders of the court." 11 U.S.C. § 1142. The Bankruptcy Court noted that it was not only the actions of the shareholders that served as the basis for sanctions, but their "inaction" as well. March 12 Oral Decision at 68:4–11. A core finding of the Bankruptcy Court was that the Former Majority Shareholders "have never taken any steps to cause Holdings or its subsidiaries to support foreign recognition of the confirmation order." *Id.* at 72:4–6.

The court explained too that for the purposes of the contemplated sanctions, the actions of the Former Majority Shareholders could not be disentangled from the actions of Mr. Hadjieleftheriadis as the President of Glafkos Trust and the owner of Lassia. Bankr. Dkt. No. 1472. The Bankruptcy Court determined that "with Mr. Hadjieleftheriadis in these roles," Provisional Holdings "filed oppositions to both the Liberian and Greek proceedings initiated by reorganized Eletson Holdings, seeking recognition of the confirmation order." March 12 Oral Decision, at 67:16–21; *see* Bankr. Dkt. No. 1459 at ECF pp. 424. The Bankruptcy Court explained too that "even if the former majority shareholders did not technically initiate foreign opposition proceedings, they are capable of and empowered to influence or at least attempt to [influence]" the "purported provisional board and/or the former minority shareholders," and thereby could have prevented them from continuing in their course of conduct. March 12 Oral Decision at 71:16–21.

The March 13 Order also reserved Holdings' rights to seek (i) an increase of the penalty amount if the Sanctions Order was not complied with within fourteen days and (ii) "additional coercive and compensatory monetary sanctions in to-be-determined amounts, including, without limitation, to pay for Reorganized Eletson Holdings Inc.'s fees and expenses in connection with the Motion, the Sanctions Motion, the Liberian proceedings, the Greek proceedings, and all further actions related hereto."  March 13 Order ¶¶ 1–3.

F.     **Further Orders of the Bankruptcy Court**

Following the conduct relevant to the present appeal, proceedings on contempt and sanctions have continued in the Bankruptcy Court.  In a May 15, 2025 oral decision and a July 2, 2025 order, the Bankruptcy Court determined that in light of the fact that the violating parties "continue to willfully disregard this Court's decisions and orders, including the Confirmation Order, the January 24 Decision, the Consummation Order, the February 20 decision, the AOR Sanctions Order, the March 12 Decision, and the Foreign Opposition Sanctions Order," their "noncompliance further warrants the award of attorneys' fees and costs as additional sanctions." Bankr. Dkt. No. 1712 (the "July 2 Order") ¶¶ A, B; *see* Bankr. Dkt. No. 1696 (the "May 15 Oral Decision") at 52:2–11.

The same day that the Bankruptcy Court entered its July 2 Order, it issued an Oral Decision as well, in which found that the violating parties continued not to comply with the court's earlier orders.  Bankr. Dkt. No. 1721.  Judge Mastando found that the relevant parties continued to resist Holdings' efforts for recognition abroad in contravention of the prior orders, and that Emmanuel Andreolakis, identified as the AOR, had even commenced a proceeding in the Marshall Islands, where Holdings was redomiciled, against Holdings and the other parties for redesignating the AOR.  *Id.* at 58:18–59:2.  Judge Mastando noted too that former officers of Holdings initiated proceedings in Germany seeking to stop Berenberg Bank from releasing

certain accounts to Holdings.  *Id.* at 59:3–11.  Accordingly, the Bankruptcy Court increased the sanctions on the violating parties to $10,000 dollars a day for noncompliance in an accompanying written Order on July 8, 2025.  Bankr. Dkt. No. 1716 ¶ 3.

## PROCEDURAL HISTORY

In the present appeals, both Provisional Holdings, Reed Smith, and the Former Majority Shareholders appeal all elements of the Bankruptcy Court's Consummation Order.  Provisional Holdings and the Former Majority Shareholders appeal all elements of the March 13 Order.

On February 13, 2025, "Provisional Holdings," represented by Reed Smith, as well as Reed Smith on its own behalf, appealed the Consummation Order and incorporated Oral Decision.  No. 25-cv-1312, Dkt. No. 1.  Holdings submitted a motion to dismiss the appeal and accompanying memorandum of law on March 10, Dkt. Nos. 5, 6, to which Provisional Holdings responded in opposition on March 24, Dkt. No. 7, and Holdings replied on March 31, Dkt. No. 9. The Former Majority Shareholders also appealed the Consummation Order and incorporated oral decision on February 5, 2025.  No. 25-cv-1685, Dkt. No. 1.  Holdings submitted a motion to dismiss the appeal and an accompanying memorandum of law on March 10, Dkt. Nos. 7, 8, which the Former Majority Shareholders opposed on March 31, Dkt. No. 17, and Holdings replied on April 7, Dkt. No. 19.

The Former Majority Shareholders appealed the Bankruptcy Court's March 13 Order incorporating its March 12 Oral Decision on March 26, 2025.  No. 25-cv-2897, Dkt. No. 1.  They filed a brief in support on June 9, 2025, with an attached appendix, Dkt. No. 10, which Holdings opposed on July 9 with its own appendix, Dkt. No. 11, and to which the Former Majority Shareholders responded on July 23, Dkt. No. 12.  Provisional Holdings appealed the March 13 Order as well on March 23, 2025.  No. 25-cv-2824, Dkt. No. 1.  Provisional Holdings filed its brief as appellant on June 9, 2025, with an attached appendix, Dkt. No. 19, to which Holdings

responded on June 24 with its own appendix, Dkt. No. 25, and Provisional Holdings replied on

July 1, Dkt. No. 27. In the same matter, No. 25-cv-2824, Holdings moved to dismiss the appeal

on June 17, 2025, attaching two exhibits. Dkt. Nos. 24, 25. Provisional Holdings opposed the

motion, with an attached exhibit, on June 24, Dkt. No. 26, to which Holdings replied on July 1,

Dkt. No. 27.

After the Bankruptcy Court awarded Holdings' fees and costs as further sanctions on

May 15, as confirmed in the July 2 Order, Provisional Holdings appealed those orders. No. 25-

cv-6164, Dkt. No. 1. That case remains pending, and no briefing or motions have been

submitted. The Former Majority Shareholders also appealed the Bankruptcy Court's July 8 order

(and the July 2 oral decision incorporated therein) on July 16, 2025. No. 25-cv-6220, Dkt. No.

1.[8] Provisional Holdings appealed the same on July 22. No. 25-cv-6316, Dkt. No. 1.[9]

## LEGAL STANDARD

In reviewing the determinations of a bankruptcy court, district courts have jurisdiction to

hear appeals only "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). *See In re*

*Chateaugay Corp.*, 880 F.2d 1509, 1511 (2d Cir. 1989). If review is appropriate, questions of

law are reviewed *de novo* and questions of fact under the "clearly erroneous" standard. Fed. R.

---

[8] Elafonissos Shipping, a Former Minority Shareholder, was also an appellant in No. 25-cv-6220. Issues specific to Elafonissos Shipping Co. are also central to the appeals in Nos. 25-cv-6182 and 25-cv-6240. In No. 25-cv-6182, Elafonissos appeals the Bankruptcy Court's July 8, 2025, Order, and in No. 25-cv-6240, Elafonissos appeals the Bankruptcy Court's March 13 Order. In response to this Court's Order, Dkt. No. 5, counsel for Elafonissos requested that as applied to that appellant, the case not be consolidated with the others because they concern "whether the lower court has personal jurisdiction over Elafonissos." *See* 25-cv-6182, Dkt. No. 8.

[9] The Former Majority Shareholders appealed also the Bankruptcy Court's order authorizing Mr. Spears to act as the foreign representative of Holdings in Liberia and Greece for the purposes of seeking recognition of the Confirmation order in those jurisdictions. *In re Eletson Holdings*, No. 25-cv-2811, Dkt. No. 1. No briefs or motions were submitted, and this Court issued an Order on July 8, 2025 requiring the appellant to show cause why the case should not be dismissed. Dkt. No. 12. Appellant did not respond to the order. That appeal is therefore dismissed.

of Bankr. P. 8013; *R2 Invs., LDC v. Charter Communs., Inc.*, 691 F.3d 476, 483 (2d Cir. 2012), *cert denied*, 133 S. Ct. 2021 (2013). A bankruptcy court's imposition of sanctions "is reviewed for abuse of discretion." *In re Markus*, 78 F.4th 554, 563 (2d Cir. 2023).

## DISCUSSION

Holdings argues that the appeals in Nos. 25-cv-1312, 25-cv-1685, and 25-cv-2824 should be dismissed for several independent reasons: (1) appellant Provisional Holdings does not exist and it has no standing to appeal; (2) none of the appellants is an "aggrieved party," and (3) the Consummation Order is not a final order appealable in this Court. *See* No. 25-cv-1312, Dkt. No. 6 at 7–10; No. 25-cv-1685, Dkt. No. 8 at 7–10; No. 25-cv-2824, Dkt. No. 24 at 9–10. Provisional Holdings, Reed Smith, and the Former Majority Shareholders oppose both motions on all grounds.

Appellant Provisional Holdings argues that this Court should reverse the Bankruptcy Court's March 13 Order in appeal No. 25-cv-2824 because the order violated due process and impermissibly applied the Bankruptcy Code extraterritorially. *See* Dkt. No. 19. It argues in the alternative that this Court should abstain from the merits pending adjudication by the Court of Appeals. *Id.* Holdings argues in response that Provisional Holdings does not exist and so cannot have had its due process rights violated and that the sanctions order does not violate principles of international comity. Dkt. No. 28.

The Former Majority Shareholders argue in No. 25-cv-2897 that the March 13 Order should be reversed because the Bankruptcy Court failed to make the findings required before imposing a foreign anti-suit injunction and sanctioned the Former Majority Shareholders for the actions of third parties for whom they are not responsible, and because the remaining basis for sanctions has since been eliminated. *See* Dkt. No. 10. Holdings responds that the Bankruptcy

Court's orders were fully consistent with applicable law governing the imposition of sanctions. Dkt. No. 11.

## I.       Provisional Holdings Has No Standing to Appeal the Bankruptcy Orders

This Court first addresses whether the entity that has fashioned itself as "Provisional Holdings" is a legal entity with standing to appeal the orders of the Bankruptcy Court. "[L]egal existence under state (or in this case, foreign) law is a condition of Article III standing." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021); *see Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 15 (2d Cir. 2023) (same). "It is beyond dispute that a party seeking to invoke the jurisdiction of a federal court bears the burden of establishing it . . . [and] [t]his principle extends to appellate jurisdiction." *Jok v. City of Burlington, Vt.*, 96 F.4th 291, 293 (2d Cir. 2024). Because Provisional Holdings has not met that burden, it has no standing to pursue the instant appeals.

It is necessary first to understand the background of Provisional Holdings in order to rule on its legal existence. The moniker was first introduced in the Bankruptcy Proceedings by Reed Smith in a submission on December 10, 2024. Reed Smith there used the term to describe "[t]he provisional board of directors of Eletson Holdings, Inc." as it had purportedly been constituted in the Piraeus proceedings in Greece. Bankr. Dkt. No. 1293 at 1. Soon thereafter, Reed Smith acknowledged that the Bankruptcy Court had not recognized the entity, clarifying in a letter to the court that it should rule "insofar as Your Honor has determined that Provisional Holdings still exists in some fashion and is entitled or required to have counsel." Bankr. Dkt. No. 1407 at 1. Without receiving any response to that question, Reed Smith began addressing letters "on behalf of Provisional Holdings" on February 5, 2025. Bankr. Dkt. No. 1410.

This Court has referred to the "provisional board" only in acknowledging that one had been constituted *ex parte* by the Piraeus Court in November of 2024. *See, e.g.,* No. 24-cv-8672,

Dkt. No. 66 ("Feb. 14 District Court Order") at 62:7–9.  That provisional Greek court order

cannot serve as the basis for Provisional Holdings standing to appeal.  On June 6, 2025, the

Court of First Instance of Piraeus in Greece issued an order dismissing the *ex parte* petition of

the so-called Provisional Board, and in doing so clarified that the basis on which it had issued the

*ex parte* order was false because "the actual registered office of Eletson Holdings Inc. was not

located in Greece at the time of the hearing of the petition in question."  Bankr. Dkt. No. 1687 at

ECF pp. 11.  That court further rejected as "unfounded" "[t]he claim that the voluntary

bankruptcy of the U.S. Bankruptcy Court—Southern District of New York on October 25, 2024,

and the court order of November 4, 2024, confirming the same, pursuant to which the

shareholding structure of the company was changed . . . and the above Board of Directors was

appointed, have no legal effect in Greece."  *Id.*

On appeal, Provisional Holdings argues that "a *different* Greek court" in Athens has

separately "recognized that Holdings has an existence distinct from Reorganized Holdings."  No.

25-cv-2824, Dkt. No. 26 at 12.  That characterization, however, is inaccurate—the Athens Court

did not recognize Provisional Holdings, but rather "issued a decision dismissing and denying the

request for a provisional order appointing Adam Spears as manager of the Company."  Bankr.

Dkt. 1410 ¶ 11 (Declaration of Ioannis Markanos-Daniolos).  Given that "[t]he foreign action

that created 'Provisional Holdings' having itself been dismissed, Reed Smith presents no

evidence whatsoever that such entity enjoys legal existence under the laws of Greece or any

other jurisdiction."  *Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, 2025 WL 2452351, at *4

(S.D.N.Y. Aug. 26, 2025).

Purported Provisional Holdings argues that regardless of its existence or not under Greek

law, the Bankruptcy Court has itself recognized Provisional Holdings as a legal entity in the

Confirmation Plan itself.  No. 25-cv-1312 Dkt. No. 7 at 11–12.  But the Confirmation Plan contemplated no such organization—it was clear that pre-reorganization Holdings ceased to exist upon Confirmation, and that there has always been but one Eletson Holdings.  Confirmation Order ¶ 7.  The existence of a pre-bankruptcy debtor, the bankruptcy estate, and the post-bankruptcy business is a "legal fiction," and a "successful chapter 11 reorganization (involving a single debtor) typically involves only one actual legal entity."  *In re Essar Steel Minnesota, LLC*, 652 B.R. 709, 712 (Bankr. Del. 2023); *see id.* at 712 n.1 ("The debtor gives way to the estate at the time of initial filing, the estate gives way to the post-bankruptcy entity on confirmation of the plan, and the post-bankruptcy business survives the confirmation.") (quoting *A Theory of Absolute Priority*, 1991 Ann. Surv. Am. L. 9, 12 (1992)).  "To determine whether or not entities are the same the court must look to the substance of the Reorganization Plan."  *ASARCO LLC v. Goodwin*, 756 F.3d 191, 203 (2d Cir. 2014) (quoting *Cross Media Mktg. Corp. v. Cab Mktg., Inc.*, 367 B.R. 435, 451 (Bankr. S.D.N.Y. 2007)); *see also In re Boston Regional Medical Ctr.*, 410 F.3d 100, 104 n.1 (1st Cir. 2005).  As in *ASARCO*, the Confirmation Plan here defined Reorganized Eletson Holdings "to be one and the same as the Debtor as of the effective date of the Plan."  *ASARCO*, 756 F.3d at 203.  Looking to the language of the Plan itself, it defined Reorganized Holdings as "reorganized Eletson Holdings from and after the Effective Date."  Confirmation Plan § 1.126.  On that Effective Date, all "property in each Estate, including . . . interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries and affiliates shall vest in Reorganized Holdings."  *Id.* § 5.1.  The Debtor's existing management and governance structure was replaced with the New Board, *id.* § 5.10, and the Debtors confirmed the condition precedent that "the Debtors' assets, including, without limitation, the Debtors' books and records, shall have been transferred to Reorganized Holdings," *id.* § 9.1.  The Plan is

22

clear that it did not create a new entity upon the Effective Date—instead, it changed who owned and controlled Eletson Holdings. As this Court has already found, "[a]s of the effective date and by order of the bankruptcy court, Eletson Holdings is now the reorganized Eletson Holdings," and "there are not two separate Eletson Holdings." Feb. 14 District Court Order at 96:17–20. "As of the effective date, the authority of the prior managers of Eletson Holdings ended. The other two debtors no longer exist. The authority to manage Eletson Holdings is vested in the new board." *Id.* at 97:10–15. "It is Eletson Holdings, as managed by the new board, which has the authority under the bankruptcy court order and pursuant to the plan to take actions abroad to ensure that the plan is recognized abroad." *Id.* at 97:17–20.

Understanding both that there is not now and never was a legitimate "Provisional Holdings" under Greek law and that the Confirmation Plan did not create such an entity under U.S. law, Provisional Holdings' remaining arguments flounder. It argues that because the Bankruptcy Court acknowledged the existence of Provisional Holdings by referring to such entity throughout the Bankruptcy Proceedings, Provision Holdings must exist. No. 25-cv-2824, Dkt. No. 26 at 10; *see* March 13 Order ¶ A (imposing sanctions on "Purported Provisional Holdings"). In fact, the Bankruptcy Court has been clear throughout the bankruptcy proceedings that it has *not* recognized legal personhood of Provisional Holdings. When required to reference "Provisional Holdings" in the context of their arguments before the Bankruptcy Court, that court has always been careful to refer to it only as the "purported" Provisional Board or as "Purported Provisional Eletson Holdings," explaining that it is composed of "certain of the Previous Board members," and that "no recognition of the Greek Court Order has been sought in the U.S." Bankr. Dkt. 1520 at 7. When Reed Smith, on behalf of "Provisional Holdings," moved for a stay before the Bankruptcy Court, the court clearly stated that "purported Provisional Eletson

Holdings Inc., to the extent it purports to be a debtor in this case, lacks standing in this Court." *Id.* at 11–12.

Even if the Bankruptcy Court had referenced Provisional Holdings without qualifying its existence, there is no exception to the jurisdictional rule that "legal existence under state (or in this case, foreign) law is a condition of Article III standing" for entities that have been passingly referenced by a court. *See Fund Liquidation Holdings*, 991 F.3d at 386.[10]  Nor can the fact that the Bankruptcy Court imposed sanctions on "Purported Provisional Holdings" in the March 13 Order grant it legal personhood.  The court cannot impose sanctions on an entity that does not exist.  But a sanctions order cannot by an act of legerdemain conjure an entity that did not exist prior to the sanctions order.  Although the imposition of pecuniary sanctions on Provisional Eletson might, were it a legal entity, make it a "person aggrieved" by the Bankruptcy Court order, being so aggrieved does not by reverse implication create legal entity status.  *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991).[11]

In effect, through their appearance as Provisional Holdings, the former owners and directors of Holdings seek a backdoor means to appeal and challenge the Confirmation Order. On the effective date of the Plan of Confirmation, directors chosen according to the Plan submitted by the Petitioning Creditors replaced those chosen by the Debtors, and the equity held

---

[10] For similar reasons, Provisional Holdings' argument that Holdings itself requested relief against it, thereby conferring standing, is meritless.  Whether or how a party to the Bankruptcy Proceedings referred to the entity purporting to be Provisional Holdings has no bearing on this Court's jurisdictional analysis.  *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject matter jurisdiction upon a federal court.") (citation omitted).

[11] The response to the question posed by Reed Smith in its brief opposing the motion to dismiss in No. 25-cv-1312, Dkt. No. 7 at 2 ("If Provisional Holdings does not exist, then how can it be held in contempt and liable for sanctions?"), may be simply that it cannot be sanctioned.  Given that the same persons that constitute the alleged entity "Provisional Holdings" are at the helm too of the Former Majority Shareholders, it may ultimately be a distinction without much difference.

by the prior owners of Holdings was cancelled. Confirmation Plan § 5.2(c). The appointments of all professionals appointed by the prior owners and directors were cancelled. *Id.* § 10.6. The prior owners and directors had the opportunity to challenge the Plan in the Bankruptcy Court and exercised that opportunity. The bankruptcy court found that the competing plan submitted by the prior owners was not confirmable and found that the Plan submitted by the Petitioning Creditors was confirmable. Confirmation Opinion at 5. The prior owners also had the opportunity to challenge the Plan on appeal and to seek an order preventing the Plan from going into effect, in their own names rather than in the name of Holdings. They also could have sought a stay and posted the necessary bond but chose not to do so. And, even if the prior owners had properly effected an appeal, "absent a stay," a party "must promptly comply with the order" of confirmation. *Maness v. Meyers*, 419 U.S. 449, 458 (1975). In effect, the former Debtors are attempting, through the guise of renaming themselves, to get a form of relief that they forwent when they did not seek a stay—the right to speak on behalf of Holdings. However, "[a] voluntary debtor in a bankruptcy cannot rely on the benefits afforded by the Bankruptcy Code without also being subject to the consequences of the Bankruptcy Code." *In re Cambridge Analytica*, 596 B.R. 1, 5 (Bankr. S.D.N.Y. 2019) (citation and internal quotation omitted). One of those consequences is that when creditors of the bankrupt entity submit a plan that provides relief to an entity's creditors superior to that offered by the debtors-in-possession, the debtors-in-possession lose control of the entity. That is not an unfair result of bankruptcy. It is a feature of the bankruptcy system.

As a last attempt at proving its right to appeal the Bankruptcy Court's decisions, Provisional Holdings argues that the Second Circuit has recognized it as a distinct legal entity with standing to appeal. In a June 25, 2025, order issued in *Eletson Holdings Inc. v. Levona*

*Holdings Ltd.*, No. 25-445, Dkt. No. 67 (2d Cir. June 25, 2025), the Second Circuit referred to a

merits panel Holdings' motion to dismiss the appeal taken in the name of "Eletson Holdings

Inc." Holdings, following the effective date of the Plan, argued that the appeal brought by Reed

Smith should be dismissed because Reed Smith no longer represented Holdings and could not

litigate in its name. No. 25-445, Dkt. No. 32(2d Cir. Mar. 20, 2025). It pointed to the change of

control provisions of the Plan. *See* § 2.5(a). Reed Smith opposed that argument. In denying

Holdings' motion to dismiss the appeal, the Circuit refused to decide whether Holdings'

description of itself was accurate, leaving to the merits panel the question "who

controls Eletson Holdings, Inc., and what effect that control has on the appeal." *See* Case No.

25-445, Dkt. No. 67. Provisional Holdings argues from that statement that the Second Circuit

had concluded that Provisional Holdings enjoyed legal identity and is the real Holdings. No. 25-

cv-1312 Dkt. No. 7 at 12–13.

      Provisional Holdings argues, in effect, that this Court should assume that because

Provisional Holdings asked the Second Circuit to decide whether it had legal identity and was in

control of Eletson Holdings, Inc., that court also necessarily has decided that Provisional

Holdings exists and controls Holdings' assets. Generally, however, "an unpublished summary

order[] is not precedential." *Hoefer v. Board of Educ. of the Enlarged City School Dist. of*

*Middletown*, 820 F.3d 58, 65 (2d Cir. 2016); *see* 2d Cir. Local R. 32.1 ("Rulings by summary

order do not have precedential effect.") But "'denying summary orders precedential effect does

not mean that the court considers itself free to rule differently'" where a prior ruling is "squarely

on point." *Akhter v. Compass Grp. USA*, 2022 WL 4638635, at *1 (S.D.N.Y. Sept. 30, 2022)

(quoting *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010)). A "decision on the interim

legal status" of an action might in some cases "constitute a form of precedent" where it "provides

guidance." *Trump v. CASA, Inc.*, 606 U.S. 831, 874 (2025) (Kavanaugh, J., concurring). However, here, all the motions panel decided was that a merits panel should decide the legal status of Holdings and Provisional Holdings. The motions panel did not foreshadow how the merits panel would decide that issue. Without any ruling by the Second Circuit to the contrary, the fact that Reed Smith has appealed rulings of this Court has no bearing on their current validity. *See Diaz-Roa v. Hermes Law, P.C.*, 2025 WL 1151483, at *4 (S.D.N.Y. Apr. 18, 2025).

Having determined that Provisional Holdings is not a legal entity with standing to sue in this Court, its appeals are hereby dismissed. The appeal in case number No. 24-cv-2824 is therefore dismissed, and the Court will consider only the arguments as to Reed Smith in appeal No. 25-cv-1312.

## II.    The Former Majority Shareholders and Reed Smith Do Not Have Standing to Appeal the Consummation Order

Holdings has also moved to dismiss the appeals of the Former Majority Shareholders and Reed Smith, in its individual capacity, of the Consummation Order on different grounds. Holdings argues that because the Consummation Order was not a final order, this Court does not possess jurisdiction over the appeals. However, a distinct jurisdictional hurdle, standing, prevents this Court from reaching the question of finality.[12]

"Standing is a 'threshold question in every federal case, determining the power of the court to hear the suit.'" *In re Windstream Holdings Inc.*, 614 B.R. 441, 450 (S.D.N.Y. 2020) (quoting *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012)). "In addition to the

---

[12] Holdings raised standing only in its reply briefing. No. 25-cv-1312, Dkt. No. 9 at 5–6, No. 25-cv-1685, Dkt. No. 19 at 2–3. Nonetheless, it is an "independent obligation" of a court "to consider the presence or absence of subject matter jurisdiction *sua sponte*." *Diageo N. Am. Inc. v. W.J. Deutsch & Sons Ltd.*, 2024 WL 2712636, at *3 (2d Cir. May 28, 2024) (summary order) (cleaned up).

requirements imposed by Article III of the Constitution, an appellant in a bankruptcy case must be 'a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court.'" *Id.* (quoting *In re DPH Holdings Corp.*, 468 B.R. 603, 612 (S.D.N.Y. 2012)). "This test is 'stricter than Article III's 'injury in fact' test, and its 'stringency . . . is rooted in a concern that freely granting open-ended appeals to those persons affected by bankruptcy court orders will sound the death knell of the orderly disposition of bankruptcy matters.'" *In re Barnet*, 737 F.3d 238, 242 (2d Cir. 2013) (quoting *In re Gucci*, 126 F.3d 380, 388 (2d Cir.1997)).

"Hence, a party to the bankruptcy proceedings is permitted to appeal a particular order only if the order directly affects his pecuniary interests." *In re Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988); *see In re Kaspar Town of Putnam Valley v. Kaspar*, 2021 WL 1226586, at *9 (S.D.N.Y. Mar. 31, 2021) ("'[I]n practical terms,' the heightened standing requirement in bankruptcy appeals 'means that an appellant cannot proceed with an appeal if it cannot demonstrate that it suffered a direct financial injury as a result of the order.'") (citing *In re Lehman Brothers Holdings, Inc.*, 2020 WL 1503473, at *1 (S.D.N.Y. Mar. 30, 2020)). "Pecuniary" denotes an interest "of or relating to money; monetary." Black's Law Dictionary (11th ed. 2019); *see In re DPH Holdings Corp.*, 468 B.R. at 612 ("The 'aggrieved person' standard require than appellant show both 'injury in fact' under Article III, and that the injury suffered is direct and financial."). [13]  This Court has previously considered too whether an Order

---

[13] The Second Circuit has continued to apply the "aggrieved person" test for standing even after the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). In that case, the Court held that as to the Lanham Act, courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* at 128. But this Circuit has not expanded the reasoning of that opinion to the context of bankruptcy appeals. *See, e.g., In re 22 Fiske Place, LLC*, 2023 WL 4278189, at *3 (2d Cir. Jun. 30, 2023); *In re AMR Corp.*, 2023 WL 2770228, at *1 (2d Cir. Apr. 4, 2023); *see also In re Highland Capital*

"diminish[es appellants'] property, increase[es their] burdens, or detrimentally affect[s their] rights." *In re Eletson Holdings*, 2025 WL 1898931, at *5 (S.D.N.Y. July 9, 2025) (citing *Matter of Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1191 (9th Cir. 2018)).

Applying even that more relaxed standard to Reed Smith's and the Former Majority Shareholders' appeal of the Consummation Order, they are not "aggrieved" so as to have standing to appeal. The Consummation Order required the parties to (1) "comply with the Confirmation Order," and (2) "take all steps reasonably necessary as requested by Holdings to unconditionally support the effectuation, implementation, and consummation of the Plan" by updating the AOR and LISCR documents. Consummation Order ¶¶ 1–2. It imposed no direct monetary sanctions. *Id.* ¶ 5. The Consummation Order did not itself diminish the property of Reed Smith or the Former Majority Shareholders, increase their burdens, or detrimentally affect their rights. As noted, the Confirmation Order itself directed "Debtors . . . and each of their Related Parties" "to cooperate in good faith to implement and consummate the Plan." Confirmation Order ¶ 5(i). It also enjoined all "parties in interest" including "their respective present or former employees, agents, officers, directors, principals, and affiliates" from "taking any actions to interfere with the implementation or consummation of the Plan." *Id.* at 12. Those directions and injunctions were broad. They also were directed to Reed Smith and the Former Majority Shareholders, among others, as Related Parties and parties in interest (as former affiliates). The Consummation Order did not impose any obligations upon Reed Smith or the

---

*Management, L.P.*, 74 F.4th 361, 368 (5th Cir. 2023) (holding that "aggrieved person" standard survives *Lexmark*); *but see Kiviti v. Bhatt*, 80 F.4th 520, 534 n.11 (4th Cir. 2023) (stating that "whether bankruptcy appellate standing survives the Supreme Court's decision in [*Lexmark*] is an open question"); *In re Schubert*, 2023 WL 2663257, at *2–*3 (6th Cir. Mar. 28, 2023) (calling into question the "aggrieved person" test as a jurisdictional bar but stating that "the substance of the person-aggrieved test might live on as a zone-of-interest test").

Former Majority Shareholders that those parties did not already bear as a result of the Confirmation Plan and Confirmation Order.  The notion that Reed Smith and the Former Majority Shareholders would be obligated to cooperate in the updating of the AOR and LISCR documents was not something foreign to the Confirmation Order.  The updating of corporate documents to ensure that they reflected the very change in ownership and control that was the object of the Plan was central to the consummation of the Plan.  Thus, the Consummation Order did not impose any new obligations on Reed Smith and the Former Majority Shareholders; it only purported only to enforce compliance "with the Confirmation Order and the Plan" "[p]ursuant to section 1142 of the Bankruptcy Code."  Consummation Order ¶ 1.  The Consummation Order just made explicit and singled out an obligation that was already implicit in the obligations imposed on Reed Smith and the Majority Shareholders by the Confirmation Order.

Thus, the argument by Reed Smith that their obligations under the Plan were "expanded from 'cooperating in good faith to implement and consummate the Plan,' under the Confirmation Order to 'taking all steps reasonably necessary as requested by Reorganized Holdings' new board to unconditionally support the implementation of the plan,' including 'taking all steps reasonably necessary to update or amend'" the AOR and LISCR is without merit.  No. 25-cv-1312, Dkt. No. 7 at 15.  So too is Former Majority Shareholders' argument that the Consummation Order does not just clarify the scope of the Confirmation Order, but rather "was a positive injunction requiring the Majority Shareholders to undertake specific actions."  No. 25-cv-1685, Dkt. No. 17 at 7.

The Bankruptcy Court retains post-confirmation jurisdiction to "interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization."  *In re*

*Petrie Retail*, 304 F.3d 223, 230 (2d Cir. 2002).  And where, as here, the Bankruptcy Court has

done so, this court "should defer to" the bankruptcy court's "interpretation of its own order,"

which it is in the best position to understand.  *Powell v. Omnicon*, 497 F.3d 124, 133 (2d Cir.

2007) (quoting *In re Case*, 198 F.3d 327, 334 (2d Cir. 1999)).  The Consummation Order is

correctly understood as a valid exercise of the Bankruptcy Court's power to enforce its prior

order.  If there is any daylight between the Confirmation Order's instruction that Reed Smith and

the Former Majority Shareholders "cooperate in good faith" and the Consummation Order's

instruction that those same parties "take all steps reasonably necessary," the necessity of the

Related Parties facilitating the updating of the AOR and LISCR records does not fall within it.

The ability of Holdings post-bankruptcy to operate and control the shipping company's ships

registered in Liberia is fundamental to its business.  To understand "good faith" cooperation to

exempt a reasonable and necessary step to effectuate that control would render the term

meaningless.

　　As this Court has previously held, the Confirmation Order is "binding on the former

shareholders that participated in the bankruptcy process and on their counsel," and so "to the

extent the Plan has not yet been" implemented, "the former shareholder and their counsel should

simply be helping to effectuate" that implementation.  *Eletson Holdings Inc. v. Levona Holdings

Ltd.*, 2025 WL 893686, at *13 (S.D.N.Y. Mar. 24, 2025).[14]  Because the Confirmation Order

---

[14] Provisional Eletson and Reed Smith argue too that the Consummation Order expanded the
scope of the Confirmation Order by requiring "third-party, foreign shareholders to take actions
not specifically enumerated or required by the terms of the Plan or the Confirmation Order."  No.
25-cv-1685, Dkt. No. 17 at 9–10.  Regardless of whether that is true, what, if anything, the
Consummation Requires a third party to do does not make Reed Smith or the Former Majority
Shareholders an aggrieved party.

neither imposes pecuniary costs nor increases the parties' burdens, they cannot now claim to be "aggrieved" by the Consummation Order such that they have standing to appeal.[15]

In effect, once again, this argument is but a disguised attempt to collaterally attack the Confirmation Order itself. They seek to attack through a challenge to the Consummation Order obligations they already bore as a result of the Confirmation Order. But, if their position were adopted, no order of a bankruptcy court could ever be final. A party unhappy with an order of that court could revive an already expired right to appeal and obtain the stay that it effectively forewent by the simple expedient of ignoring the court order, pretending it did not exist, and then arguing that the original order itself was invalid when the bankruptcy court seeks to vindicate the original order by its powers of contempt. However, "once a bankruptcy court's injunction becomes final, any enjoined parties who had notice and opportunity to object, but did not do so, cannot later collaterally attack the order." *In re Old HB, Inc.*, 525 B.R. 218, 223 (Bankr. S.D.N.Y. 2015) (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150–52 (2009)); *see* 8 Collier on Bankruptcy ¶ 1141.02 (16th ed. 2021) ("[A] confirmed plan precludes parties from

---

[15] This analysis mirrors, in many respects, the one this Court would undertake if determining whether the Consummation Order was a "final" order conferring jurisdiction on this Court. District courts possess appellate jurisdiction over "final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1). Where the bankruptcy court is engaged in such ongoing "postjudgment proceedings," the Second Circuit has instructed that a district court "defer review" until the bankruptcy court has "decided all issues to prevent piecemeal appeals of interlocutory orders." *Amara v. Cigna Corp.*, 53 F.4th 241, 251 (2d Cir. 2022). To that end, "a district court's postjudgment order is final when it 'has finally disposed of [a] question, and there are no pending proceedings raising related questions.'" *Id.* at 250 (quoting 15B Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3916 (2d ed.)). Because the Consummation Order does not finally determine any question but is rather a continuation of enforcement of the Confirmation Order (see *infra*), it is not a final appealable order. *See Diageo*, 2024 WL 2712636, at *3 (explaining that "a postjudgment finding of contempt is not immediately appealable if it is not accompanied by sanctions.")

raising claims or issues that they could have or should have raised before confirmation.")  "This is because the 'finality interests' of res judicata 'are particularly important in the bankruptcy context, where numerous contending claims and interests are gathered, jostle, and determined and released.'"  8 Collier ¶ 1141.02 (quoting *In re American Preferred Prescription, Inc.* 255 F.3d 87, 93 (2d Cir. 2001)).

      The parties before this Court had the opportunity to contest the Confirmation Order itself and could have raised their complaints in that posture.  Under the Bankruptcy Code, a "party in interest," including "an equity security holder," "may raise and may appear and be heard on any issue in any case under this chapter."  11 U.S.C. § 1109(b).  And specifically, "[a] party in interest may object to the confirmation of a plan."  11 U.S.C. § 1128(b).  The Former Majority Shareholders and their counsel Reed Smith were capable of such objection on a timely basis.  The Former Majority Shareholders objected to the Creditor Committee's request for a Chapter 11 Trustee, Bankr. Dkt. Nos. 518, 597, filed discovery related objections, Bankr. Dkt. No. 930, and submitted a brief in support of the Debtors' Second Amended Joint Plan of Reorganization, Bankr. Dkt. No. 1144.  The Former Majority Shareholders would have qualified as "aggrieved" by the Confirmation Plan as they were the prior equity owners of the company.  *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 89 (2d Cir. 2011).

      Even though they were both aggrieved and had notice, they did not file an appeal of the Confirmation Plan within the mandatory fourteen-day window.  *See* Fed. R. Bankr. P. 8002(a), (d)(2)(F) (providing fourteen days to appeal an 11 U.S.C. § 1129 order and forbidding bankruptcy courts from granting an extension); *see also* Feb. 14 District Court Order at 98:1–3 ("The previous shareholders, as proponents of the 'debtor's plan' could have sought to appeal themselves, and they did not.  For whatever reason, they chose not to.").  The Former Majority

Shareholders are not now aggrieved by the Consummation Order in any manner distinct from the Confirmation Plan and Confirmation Order, and for that reason, they lack standing to appeal the Consummation Order.  "The appellant cannot attack the bankruptcy court's [confirmation] order collaterally by appealing the bankruptcy court's denial of a separate motion" filed later.  *In re 477 W. 142nd St. Housing Dev. Fund Corp.*, 346 F. Supp. 3d 413, 414 (S.D.N.Y. 2018); *see Galella v. Onassis*, 533 F. Supp. 1076, 1096 (S.D.N.Y. 1982) ("It is fundamentally axiomatic in law that a contempt hearing for violation of a prior court order is not an avenue of attack, collateral or otherwise, of that order."); *Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 272 F. Supp. 2d 319, 324 (S.D.N.Y. 2003).  Because neither Reed Smith nor the Former Majority Shareholders have standing to pursue their appeals in Nos. 25-cv-1312 and 25-cv-1685, the appeals are dismissed.

## III.   The Former Majority Shareholders' Appeal of the March 2025 Order Fails on the Merits

The Former Majority Shareholders next appeal the Bankruptcy Court's March 13 Order (incorporating the March 12 Oral Decision) imposing sanctions.  To understand the appeal to that Order, it is important to understand the context in which it arose.  On February 20, 2025, when the Bankruptcy Court determined that the Ordered Parties remained noncompliant with the Confirmation Order and the Consummation Order, it gave those parties (including the Former Majority Shareholders) another shot at compliance.  It required the Former Majority Shareholders to "certify by Monday, February 24th, at 2 p.m. that [they] have instructed the current AOR, one, to communicate with and take direction from Reorganized Eletson Holdings, two, to update or amend the AOR as directed by Reorganized Holdings, and three, to update or amend Holdings' corporate governance documents on file with LISC as directed by Holdings." Feb. 20 Oral Decision at 106:14–21.

In response, each of the Former Majority Shareholders submitted a certification. Lassia certified that it had "no knowledge of the identity of the current AOR of Eletson Holdings Inc. and thus has been unable to communicate with the AOR," but that it nevertheless passed the instruction on to Hadjieleftheriadis. Bankr. Dkt. No. 1472 ¶¶ 1–2. It noted too that, following the certification, the shares in Lassia were transferred from Karastamati to Hadjieleftheriadis. *Id.* ¶ 4. Family Unity Trust submitted a nearly identical certification and clarified that it is no longer "owned nor managed by Mr. Vassilis Kertsikoff," and is owned instead by "Mrs. Stavriani Kertsikoff." Bankr. Dkt. No. 1473 ¶¶ 1–4. Glafkos referred to a separate certification submitted by Hadjieleftheriadis, Bankr. Dkt. No. 1474, in which he explained he was "very hesitant to instruct the lawyer who was tasked to be [the] AOR to act, given that such lawyer feels unable to assume this responsibility without protection from a Greek Court which has jurisdiction." Bankr. Dkt. No. 1482-2. He "advised the current AOR" of the Bankruptcy Court's order but did not affirm that he instructed the AOR to take any action. *Id.* It was ultimately revealed that the AOR was a member of the Provisional Board all along. Bankr. Dkt. No. 1713 at 57:18–20 (explaining that Emmanuel Andreolakis "has now been identified as the former AOR of Eletson Holdings."). On February 27, the Bankruptcy Court entered sanctions against the Former Majority Shareholders of $1,000 a day until they complied with the prior order to update the AOR and LISCR and submit the identity of the AOR. Bankr. Dkt. No. 1495 ¶ 2.

The March 12 Oral Decision and March 13 Order soon followed. In the March 13 Order, the Bankruptcy Court imposed sanctions of $5,000 per day on the Former Majority Shareholders. First, it directed the Violating Parties (defined in the Order to include the Former Majority Shareholders, the Former Minority Shareholders, purported Provisional Holdings, the purported Provisional Board, and the individual members thereof) to withdraw any foreign filings that

"oppose or undermine" the Confirmation Order, "including, without limitation, filings in the Liberian Proceedings and the Greek Proceedings."  March 13 Order ¶ 1; *see id.* at 6 (chart detailing all known foreign proceedings).  In the Liberian proceedings, the Former Majority Shareholders joined the Provisional Board in opposing a petition by Pach Shemen to recognize and enforce the Confirmation Order in Liberia, which was required to effectuate an update to the AOR and LISCR given the Debtors' continued noncompliance.  *Id*. at 6.  The "Greek Proceedings" referr both to the proceedings before the Piraeus Court where the former debtors sought to re-constitute the Provisional Board and to those before the Athens Court where they opposed Holdings' petition for recognition of the Chapter 11 Order.  *Id*.  The March 13 Order also enjoined the Violating Parties "from making any filings in any court seeking to oppose or undermine in any way the judicial recognition of the Confirmation Order, including, without limitation, by initiating, or prosecuting any legal actions that seek to oppose or undermine the Confirmation Order."  *Id.* ¶ 2.  It imposed sanctions against the Former Majority Shareholders "until such date the parties comply with the Plan, the Confirmation Order, the Consummation Order, and this Order."  *Id.*

A.    **The March 13 Order is not an Impermissible Anti-Foreign Suit Injunction**

The Former Majority Shareholders argue that the bankruptcy court failed to make findings as to the relatedness of the parties and issues before imposing a foreign anti-suit injunction, as required by the Second Circuit's decision in *China Trade & Development Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987).  They posit that such a failure is a per se abuse of discretion and that March 13 Order must therefore be reversed.  *See* No. 25-cv-2897, Dkt. No. 10 at 13–15.  It is not clear as a matter of law that the Bankruptcy Court was required to make the *China Trade* findings in exercising its power to issue orders and injunctions "necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  Nor did

the Former Majority Shareholders make any argument that the Bankruptcy Court was required to analyze those factors in the proceedings below, where they had the opportunity to do so. Regardless, on *de novo* review this Court finds that the Bankruptcy Court made the requisite findings, even though it did not refer to the *China Trade* factors by name. The bankruptcy court had the authority to issue the March 13 Order.

"The standard of review for the grant of a permanent injunction, including an anti-suit injunction, is abuse of discretion." *Paramdeics Electromedicina Comercial, Ltda v. GGE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 651 (2d Cir. 2004). "We will find such an abuse of discretion if the district court 'applies legal standards incorrectly or relies upon clearly erroneous findings of fact, or proceeds on the basis of an erroneous view of the applicable law.'" *Karaha Bodas Co., L.L.C. v Persuhaan Pertambangan Minyak Das Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007) (quoting *Register.com, Inc. v. Verio*, 356 F.3d 393, 398 (2d Cir. 2004)).

No party contests that "a federal court may enjoin a party before it from pursuing litigation in a foreign forum." *Paramedics*, 369 F.3d at 652; *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926 (D.C. Cir. 1984) ("It is well settled that English and American courts have power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions"). An anti-suit injunction operates directly on the parties over which the court maintains jurisdiction, not on the foreign courts. *See Mastercard Int'l Inc. v. Argencard Sociedad Anonima*, 2002 WL 432379, at *9 (S.D.N.Y. Mar. 20, 2002). In general, a court may impose an anti-suit injunction against initiation of or participation in parallel litigation "only if: (A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Paramedics*, 369 F.3d at 652. "If these two threshold requirements are satisfied,

courts are directed to consider a number of additional factors, including whether the parallel litigation would:

> (1) frustrat[e] . . . a policy in the enjoining forum; (2) . . . be vexatious; (3) . . . threat[en] . . . the issuing court's in rem or quasi in rem jurisdiction; (4) . . . prejudice other equitable considerations; or (5) . . . result in delay, inconvenience, expense, inconsistency, or a race to judgment.

*Karaha Bodas*, 500 F.3d at 119 (internal citations and quotations omitted). The court must consider all of these factors, but two have "'greater significance': whether the foreign action threatens the enjoining forum's jurisdiction or its 'strong public policies.'" *Id.* (quoting *China Trade*, 837 F.2d at 36). "[A]n anti-foreign-suit injunction should be used sparingly and should be granted only with care and great restraint." *China Trade*, 837 F.2d at 36. The court must show "due regard to the interests of comity." *Id.*

Before reaching the merits of the *China Trade* analysis, the Court must determine whether it applies here. The injunction contained in the March 13 Order by the Bankruptcy Court does not resemble the typical foreign anti-suit injunction in that it flowed directly from the Confirmation Order's requirement that the Former Majority Shareholders cooperate in good faith and take reasonable steps to effectuate the Plan. The Confirmation Order already "enjoined" all "holders of interest," such as the Former Majority Shareholders, "from taking any actions to interfere with the implementation or consummation of the Plan." Confirmation Order ¶ 12. Furthermore, under Section 105(a) of the Bankruptcy Code, the Bankruptcy Court retains the ability, post-Confirmation, to "issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). That Section "inherently include[s] the ability to sanction a party." *In re Avianca Holdings S.A.*, 648 B.R. 358, 362 (Bankr. S.D.N.Y. 2023) (quoting *Bessette v. AVCO Fin. Servs., Inc.*, 230 F.3d 439, 445 (1st Cir. 2000)); *see* 2 Collier on Bankruptcy ¶ 105.02 (15th ed. 2006) ("Though section 105(a) does not give the bankruptcy court

carte blanche—the court cannot, for example, take an action that is prohibited by another provision of the Bankruptcy Code—it grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." (citing *In re Caesers Entm't Operating Co.*, 808 F.3d 1186, 1188 (7th Cir. 2015)).[16]

The March 13 Order and the equitable relief contained therein is best understood as an exercise of the Bankruptcy Court's power to enforce its prior orders. The cooperation of the Former Majority Shareholders and related parties in updating the AOR and LISCR documents was central to the process of confirmation. A Liberian non-resident corporation's existing AOR "controls whether and when a corporation can make a filing with the LISCR." Declaration of James Pierre ¶ 10. And updating filings with the LISCR is the only way a Liberian corporation can modify its corporate governance documents and give them "legal effect in Liberia." *Id.* ¶ 8. Holdings was, at the relevant time, a Liberian corporation, and so the inability of its new owners to take legal control over the company in Liberia frustrated the consummation of the Confirmation Plan. The necessity to update the corporate documents would have applied equally to whomever emerged from the bankruptcy proceedings in control of the company—other than, of course, the Debtors or Former Majority Shareholders who would have continued with the same AOR and LISCR registration.

To summarize, the March 13 Order required the Former Majority Shareholders to do only what they were always required to do under the Confirmation Plan and Confirmation Order, and

---

[16] Section 105(a) is often used in the context of the "automatic stay" during pre-confirmation proceedings to "enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts." *In re Adelphia Comms. Corp.*, 298 B.R. 49, 53 (Bankr. S.D.N.Y. 2003) (quoting *In re Granite Partners, L.P.*, 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996)). In that context, bankruptcy courts have not considered the *China Trade* factors before granting such relief.

prevented them from doing only what the Plan and Order always prohibited them from doing. It may be that the March 13 Order took the form, in part, of a requirement that the Former Majority Shareholders stop making court filings seeking to oppose or undermine the judicial recognition of the Confirmation Order, but that is only because the Former Majority Shareholders' actions to frustrate the Confirmation Plan took the form of court filings. Given the actions of the Former Majority Shareholders, the Bankruptcy Court had no choice but to enjoin them from instituting foreign lawsuits to challenge the Plan if the Confirmation Order and the Plan were to have any effect. If the Bankruptcy Court did not have that power to effectuate the Confirmation Plan, the uncertainty and lack of finality would result in few, if any, creditors willing to contribute value to a bankrupt entity. Few corporations with assets located abroad could ever safely emerge as an operating company from bankruptcy.

The power exercised by the Bankruptcy Court is central to the bankruptcy process. It is axiomatic that the Bankruptcy Court enjoys exclusive jurisdiction over "all the property, wherever located, of the debtor as of commencement of such case, and of property of the estate." 28 U.S.C. § 1334. It also is fundamental to the bankruptcy process that both "the debtor and any other necessary party" have a legal duty to "execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by the confirmation plan." 11 U.S.C. § 1142. The bankruptcy process could not exist without those provisions. It necessarily follows that, if a creditor or any "party in interest" (which includes an equity security holder), 11 U.S.C. § 1109, has an objection to a plan of confirmation or believes that such plan is not feasible, they raise that objection before the plan is confirmed. Once the plan is confirmed, all participants—those who are contributing capital as well as those who may be getting relief as a result of the discharge from bankruptcy—are entitled to certainty.

The Debtors here voluntarily converted the bankruptcy to Chapter 11, submitted their own plan and objected to that of the Petitioning Creditors, and enjoyed the benefits of bankruptcy.  If they thought that the AOR could not be changed or that the corporate documents could not be updated in the LISCR without a Liberian court order, the time for them to have made those arguments would have been before the plan was confirmed, and the forum in which those arguments should have been made was before the Bankruptcy Court.  Although it is uncontroversial that bankruptcy proceedings need to be recognized in foreign jurisdictions before they are effective there, the Debtors never asserted prior to confirmation that the Confirmation Plan "was not feasible because it would require approval by Liberia and Greece," and that recognition "would not be forthcoming."  Feb. 14 District Court Order at 39:16–23.  Holdings therefore proceeded post-Confirmation under the unchallenged assumption that the amended documents would be pre-cleared by the LISCR and updated immediately upon the effective date. *See* Declaration of James Pierre ¶ 18 (explaining that the Amended Articles of Incorporation were submitted for pre-clearance on November 13, 2024).

It is neither surprising nor fatal that the Confirmation Plan itself did not expressly proscribe vexatious foreign proceedings filed in Liberia and Greece for the purpose of or with the effect of preventing the new owners of Holdings from taking control of the corporation.  It would not have been possible for the Bankruptcy Court to foresee every roadblock that the Former Majority Shareholders might throw in the way of effectuation of the Confirmation Order.  The Confirmation Plan's language that they cooperate in "good faith" clearly covers such vexatious conduct.  *See Inst. Of Cetacean Rsch. v. Sea Shepard Cons. Soc'y*, 774 F. 3d 935, 945–55 (9th Cir. 2014) ("By construing their obligations narrowly to include only refraining from acts specifically enumerated in the injunction, and not acts likely to nullify the injunction, the

Defendants assumed the risk that their attempts at technical compliance would prove wanting. We accordingly reject the Defendants' good faith argument, and hold [Defendants] in civil contempt."), *cert. denied*, 576 U.S. 1005 (2015).  To permit the Former Majority Shareholders to have yet another bite at the apple, many months after the Plan has gone into effect, by virtue of their disobedience of the Confirmation Order and of the obligations they owed under the Bankruptcy Code, would be to create confusion and uncertainty in every bankruptcy involving a corporation whose operations cross borders.

To support their argument that the Bankruptcy Court was nevertheless required to undertake a *China Trade* analysis, the Former Majority Shareholders cite to *In re Millenium Seacarriers, Inc.*, 458 F.3d 92 (2d Cir. 2006), in which the Second Circuit remanded a case to the bankruptcy court for failure to consider those factors as directed by a prior circuit panel.  *Id.* at 97.  There, the Circuit declined to limit the application of *China Trade* to only "permanent injunctions," and noted that the factors govern any "order of a court to 'enjoin a party before it from pursuing litigation in a foreign forum.'"  *Id.* (quoting *Paramedics*, 369 F.3d at 652).  That case, though, does not resolve the dispositive question here, because in *Millenium Seacarriers* the bankruptcy court had not yet confirmed a plan of reorganization.  *See In re Millenium Seacarriers*, 2005 WL 2398014, at *6 (S.D.N.Y. Sept. 28, 2005).  Also, in that case the bankruptcy court issued a preliminary foreign anti-suit injunction at the request of a third party in connection with a foreign arbitration initiated by the debtor itself.  *See In re Millenium Seacarriers, Inc.*, 54 F. App'x 333, 335 (2d Cir. 2002) (summary order).  By contrast, the injunction here was issued at the request of the reorganized entity, Holdings, to effectuate the Confirmation Plan, and it was imposed by the Bankruptcy Court under its power to enforce its existing orders.

The Court, however, need not conclude that the *China Trade* analysis does not apply to an order like the one at issue here, because the Bankruptcy Court's findings readily satisfy *China Trade* even if the court did not mention that case by name.[17]  On *de novo* review, this Court determines that the Bankruptcy Court adequately accounted for the concerns elaborated in *China Trade*.  The Second Circuit has found it unnecessary to vacate the injunction and remand for further proceedings where "as a matter of law those threshold requirements are met," even if considered "under a different rubric."  *Karaha Bodas*, 500 F.3d at 120.

The first mandatory consideration under *China Trade* is whether the parties are the same in both matters.  837 F.2d at 35.  The Bankruptcy Court enjoined the Former Majority Shareholders from participating in the Liberian and Greek proceedings on the basis that it was those exact same parties that had filed oppositions in the Liberian proceedings.  March 12 Oral Decision at 71:1–11.  It did so as well on the basis that the Former Majority Shareholders could not be disentangled from Hadjieleftheriadis in his opposition to Holdings' motion before the Athens Court—these are the same parties who, through Holdings, were parties to the Bankruptcy

---

[17] Holdings argues that the Former Majority Shareholders' waived their argument that the Bankruptcy Court impermissibly entered a foreign suit injunction without considering the *China Trade* factors because they did not raise the issue before the bankruptcy court, despite ample opportunities to do so.  No. 25-cv-2897 Dkt. No. 11 at 20.  It is true that where an argument was "available to [appellant] in bankruptcy court," and the appellant does not "offer[] any reason for its failure to raise these issues in a timely manner in that court," the argument is "waived."  *In re Johns-Manville Corp.*, 759 F.3d 206, 219 (2d Cir. 2014).  The Former Majority Shareholders do not contest that under the ordinary rules of waiver, their *China Trade* argument is unavailable; they argue instead that their argument falls into an exception to the waiver rule, and that this Court should nevertheless "consider" the "waived argument" as doing so is "necessary to avoid manifest injustice."  *Id.*; *see* No. 25-cv-2897, Dkt. No. 12 at 9–10.  However, whether a court has made the findings necessary to impose an anti-foreign suit injunction is not something that can be waived where those findings are required.  The Second Circuit has made clear that such an injunction can be entered "only" if those threshold factors are met.  *Karaha Bodas*, 500 F.3d at 119.  For the same reason, a court can enter a preliminary injunction "only" after considering the likelihood of success on the merits, irreparable harm, the balance of the equities, and the public interest.  *See Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

and subject to its Confirmation Plan (as former equity holders) and Confirmation Order (as "Related Parties"). The Bankruptcy Court determined that as "president of Glafkos Trust," and "owner and manager of Lassia Investment Company," Glafkos and Lassia being "two of the former majority shareholders," Hadjieleftheriadis caused Provisional Holdings to "file[] oppositions to both the Liberian and Greek proceedings initiated by reorganized Eletson Holdings, seeking recognition of the confirmation order." January 13 Oral Decision at 67:16–21. That explanation is sufficient for the purposes of the first *China Trade* factor, which does not require that the parties be identical, only that they are "sufficiently similar." *Eastman Kodak Co. v. Asia Optical Co., Inc.*, 118 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) (quoting *Paramedics*, 369 F.3d at 652); *see Paramedics*, 369 F.3d at 652–53 (finding two parties sufficiently similar where they were "part of the [same] group of companies," and one held most of the capital of the other); *Motorola Credit Corp. v. Uzan*, 2003 WL 56998, at *6 (S.D.N.Y. Jan. 7, 2003) (sufficiently similar where "the real parties in interest are the same in both matters.")

The second *China Trade* factor is whether "resolution of the case before the enjoining court" is "dispositive of the action to be enjoined." 837 F.2d at 25. The Bankruptcy Court explained how that requirement is met as well. The result of the Confirmation Plan is that there is *only one* Eletson Holdings. That conclusion is "dispositive" of the actions fighting the very existence of that reorganized company abroad. It does not matter that the proceedings abroad are not bankruptcy proceedings or that they arise in distinct procedural postures, where the issue of Holdings' unitary existence is at the core of each. "Courts in this circuit have found anti-suit injunctions appropriate even when the claims in the foreign and domestic actions were not precisely identical, but were at least based on the same underlying dispute." *Jolen, Inc. v. Kundan Rice Mills Ltd.*, 2019 WL 1559173, at *2 (S.D.N.Y. Apr. 9, 2019) (quoting *AU New*

44

*Haven, LLC v. YKK Corp.*, 2018 WL 2128373, at *3 (S.D.N.Y. May 8, 2018)).  Put differently, the focus is on "whether the substance of the claims and the arguments raised in the two actions is the same." *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 6156743, at *4 (S.D.N.Y. Dec. 12, 2011) (quoting *In re Vivendi Universal, S.A.*, 2009 WL 3859066, at *6 (S.D.N.Y. Nov. 19, 2009)).  By having submitted themselves to the jurisdiction of the Bankruptcy Court and asking that court to reorganize the company of which they were majority shareholders, the Former Majority Shareholders have consented to the Bankruptcy Court reorganizing the company.  As the Bankruptcy Court found, the actions of the Former Majority Shareholders abroad "have frustrated the Court's direct orders and the full implementation of the Court-ordered plan." March 12 Oral Decision at 68:8–9 (quotation marks omitted).  The actions taken by the Former Majority Shareholder abroad are not merely "parallel proceedings," but rather are a vehicle by which they are attempting to "quash" the effect of the Confirmation Order.  *Dandong*, 2011 WL 6156743, at *4.  Federal courts have "inherent power to protect their own judgments from being undermined or vitiated by vexatious litigation in other jurisdictions."  *Karha Bodas*, 500 F.3d at 124.  The Liberian or Greek courts "have no power to modify or annul" the Confirmation Plan, and the Bankruptcy Court has the "power to prevent [the Former Majority Shareholders] from engaging in litigation that would tend to undermine the regime established by" the Bankruptcy code.  *Id.* at 125.

The Bankruptcy Court discussed as well, though again not by name, many of the discretionary *China Trade* factors, and those too counsel in favor of the anti-suit injunction.  The first two additional factors, which have "greater significance," are whether the foreign action "threatens the [1] jurisdiction or [2] the strong public policies of the enjoining forum."  *Karaha Bodas*, 500 F.3d at 126.  On (1), "Congress intended to grant comprehensive jurisdiction to the

bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected to the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). Such proceedings are *in rem*, "meaning the court has jurisdiction to determine 'all claims anyone, whether named in the action or not, has to the property or thing in question.'" *In re FairPoint Communications, Inc.*, 452 B.R. 21, 27 (Bankr. S.D.N.Y. 2011) (quoting *In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2d Cir. 2010)). At their base, the foreign suits go to who can control the fleet of tankers that make up the core of Holdings' business. In this context, only one court can have "possession or . . . control of the property which is subject to the litigation in order to proceed with the cause and grant the relief sought," and so "the jurisdiction of the one court must yield to that of the other." *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939). The Bankruptcy Court described that it was exactly because the foreign suits were filed to "undermine . . . the judicial recognition of the confirmation order" that it imposed sanctions. March 12 Oral Decision at 79:24–80:10. Therefore, the foreign actions "threaten[] to undermine the [Bankruptcy Court's] judgments confirming and enforcing" the Confirmation Plan. *Karaha Bodas*, 500 F.3d at 126.

On (2), "the United States has a strong interest in applying the provisions of the Bankruptcy Code." *In re Bernard L. Madoff Investment Sec. LLC*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010); *see also In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996). Delays to the fruition of bankruptcy proceedings are "not in the public's interest" because "Congress and the courts have stressed the need for parties to be able to rely on the finality of chapter 11 plans and related orders in conducting business and dealing with the reorganized debtor." *In re BGI, Inc.*, 2012 WL 5392208, at *6 (S.D.N.Y. Nov. 2, 2012). "If plans could be overturned or rescinded except in the most extreme circumstances, the reliability of the plan

46

process would be undermined." *Id.* (quoting 8 Collier ¶ 1144.02[1]).  These attempts, through foreign litigation, to "frustrate the Court's direct orders and the full implementation of the Court-ordered plan" support imposition of the injunction.  March 12 Oral Decision at 68:8–10.

As to the remaining factors, "the discretionary *China Trade* factors will tend to weigh in favor of an anti-suit injunction that is sought to protect a federal judgment."  *Karaha Bodas*, 500 F.3d at 120.  "[V]exatiousness is 'likely to be present whenever parallel actions are proceeding concurrently,'" *Karaha Bodas*, 500 F.3d at 126 (quoting *China Trade*, 837 F.2d at 36), and so alone does little to counsel in favor of an injunction.  But the Greek and Liberian proceedings at issue in the March 13 Order are not merely duplicative, nor do they present a situation where a foreign court may simply reach an issue first as to which the domestic court would then apply res judicata principles (or vice versa).  The Former Majority Shareholders sought the protection of the Bankruptcy Court before there ever were foreign proceedings.  And the Bankruptcy Court has already reached final judgment as to the reorganization of Holdings.  The Former Majority Shareholders participated in the foreign suits with the express purpose of avoiding the consequences of the Confirmation Plan.  Finally, other equitable considerations also counsel in favor of the anti-suit injunction imposed.  The Bankruptcy Court determined that the Former Majority Shareholders were purposefully frustrating implementation of the Plan by failing to cooperate in good faith, March 12 Oral Decision at 64:3–6, that they did so as a part of a "pattern of noncompliance" and "obstructionist behavior," *id.* at 76:18, and did so to "collaterally attack the confirmation order."  *Id.* at 68:8–9.  The Bankruptcy Court has been clear too throughout the post-confirmation proceedings that the foreign lawsuits have resulted in "delay, inconvenience, [and] expense."  *China Trade*, 837 F.2d at 35.

47

Assuming that it is necessary to apply the *China Trade* factors in the context of post-confirmation bankruptcy proceedings, the Bankruptcy Court did not make an error of law constituting an abuse of discretion in the imposition of sanctions. On *de novo* review, this Court has determined that the relevant considerations from *China Trade* are met here, even though they were not discussed by name in the proceeding below.[18]

B.    **The Bankruptcy Court Did Not Abuse its Discretion in the Imposition of Monetary Sanctions for Contempt**

The Former Majority Shareholders next argue that the Bankruptcy Court's March 13 Order was issued contrary to the law of sanctions. To hold a party in contempt, a court must find that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Markus*, 78 F.4th at 566 (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). To be "clear and unambiguous," an order must enable the party enjoined "to ascertain from the four corners of the order precisely which acts are forbidden." *Monsanto v. Haskel Trading Inc.*, 13 F. Supp. 2d 349, 363 (E.D.N.Y. 1998). And civil contempt is only available where compliance is possible. *In re Marc Rich & Co., A.G.*, 736 F.2d 864, 866 (2d Cir. 1984) ("Civil contempt is a coercive sanction, and thus a person held in civil contempt must be able to comply with the court order at issue."). The bankruptcy court has power to hold a party in contempt. *Markus*, 78 F.4th at 563. This Court's review of the Bankruptcy Court's factual findings underlying its sanctions determination are reviewed for clear error, and its award of sanctions is reviewed for abuse of discretion. *Id.*

---

[18] In June 2025, this Court entered an anti-suit injunction against Apargo Ltd., Fentalon Ltd., and Desimusco Trading Ltd., Cypriot entities wholly owned by the Former Majority Shareholders, prohibiting them from participating in Greek and U.K. proceedings to confirm and enforce the arbitral award. *Eletson Holdings*, 2025 WL 1558380, at *20.

As to the first requirement, the Former Majority Shareholders' argument that the Bankruptcy Court's orders were not sufficiently clear is frivolous. Sanctions were imposed on March 13, 2025, until "the parties comply with the Plan, the Confirmation Order, the Consummation Order, and this Order." March 13 Order ¶ 3. Beginning with the Confirmation Order, the command that the parties cooperate in good faith to execute the Confirmation Plan could not be read to permit the purposeful frustration of attempts by Holdings to file amended corporate documents and thereby take control of the Liberian corporation. Confirmation Order ¶ 5(i). Participating in foreign actions contesting recognition of the Bankruptcy Plan and obfuscating the identity of the AOR are actions that are clearly "inconsistent with the plan or this confirmation order." *Id.* ¶ 5(iii); *see also id.* ¶ 12 ("[U]pon entry of this confirmation order, all holders of claims or interests or other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the plan."). Subsequently, the Consummation Order was clear that the Former Majority Shareholders were required to "tak[e] all steps reasonably necessary to update or amend (a) Holdings' AOR to reflect that Adam Spears is Holdings' AOR and (b) Holdings' corporate governance documents on file with LISCR as directed by holdings." Consummation Order ¶ 2. Such detailed instructions are clearly "specific and definite enough to apprise those within its scope of the conduct that is being proscribed or required." *Nunez v. N.Y.C. Dep't of Correction*, 758 F. Supp. 3d 190, 218 (S.D.N.Y. 2024) (quoting *Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp. 2d 594, 615 (S.D.N.Y. 2008)). The February 20 Order was clear too that the Former Majority Shareholders were required to both instruct and certify that they instructed the current AOR "to communicate with and take direction from Reorganized Eletson Holdings," to "update or amend

the AOR as directed by Reorganized Holdings," and to "update or amend Holdings' corporate governance documents on file with LISCR as directed by Holdings."  Bankr. Dkt. No. 1505 at 106:14–21.

Finally, the March 13 Order was very specific in ordering the parties to "withdraw any and all filings that oppose or undermine in any way the judicial recognition of the Confirmation Order, including, without limitation, filings in the Liberian Proceedings and the Greek Proceedings set forth," and further prohibiting the parties from "making any filings in any court seeking to oppose or undermine in any way the judicial recognition of the Confirmation Order, including, without limitation, by initiating, or prosecuting any legal actions that seek to oppose or undermine the Confirmation Order."  March 13 Order ¶ 1–2.  The Former Majority Shareholders did not argue during the course of the March proceedings that the Bankruptcy Court's instructions were unintelligible or that "additional clarity was needed."  *Nunez*, 758 F. Supp. 3d at 218.  Instead, they argued that the foreign actions were not "initiated" by the Former Majority Shareholders and so they could not take the actions required.  March 13 Oral Decision at 45:18–22.  Unwillingness to execute the Bankruptcy Court's clear orders, or disagreement with a factual premises underlying them, does not make the orders themselves unclear.

The second requirement, that proof of noncompliance be both clear and convincing, is amply met here as well.  At the time sanctions were imposed, neither of the foreign actions had been withdrawn, the Former Majority Shareholders had not instructed the AOR to update the LISCR, and the Confirmation Plan remained unfulfilled.  The Former Majority Shareholders' argument to the contrary stands or falls with their attempt to artificially narrow the basis upon which the Bankruptcy Court imposed contempt to only their participation in the Liberian action.  But the Bankruptcy Court's findings did not turn on that basis alone.  The March 13 Order

50

instructed the parties to withdraw their foreign opposition and imposed coercive monetary

sanctions on the basis of violations of the "Court's orders and this Court's findings of contempt,"

and ruled that sanction would continue until compliance with not just requirement to withdraw

foreign suits, but also with the "Plan, the Confirmation Order," and "the Consummation Order."

March 13 Order ¶ 3.  The Bankruptcy Court was clear that sanctions imposed on March 13 were

in response to the Former Majority Shareholder's failure to "comply with their obligations"

under Chapter 11, the Confirmation Plan, the Confirmation Order, and the Consummation Order.

*See* March 12 Oral Decision at 73:18–25.  That includes, as explained throughout this opinion,

the instruction that the Former Majority Shareholders cooperate in good faith, that they take

reasonable steps to effectuate the Plan, and that they "carry out the plan and [] comply with any

orders of the court."  11 U.S.C. § 1142.  It is thus not only the actions of the shareholders that

serve as the basis for sanctions, but their "inaction" as well.  March 12 Oral Decision at 68:4–11.

A core finding of the Bankruptcy Court in its imposition of sanctions was that the Former

Majority Shareholders "have never taken any steps to cause Holdings or its subsidiaries to

support foreign recognition of the confirmation order."  *Id.* at 72:4–6.  That alone would be a

sufficient basis for the imposition of sanctions.  But the court explained too that the Former

Majority Shareholders could not be disentangled from the actions of Hadjieleftheriadis as the

President of Glafkos Trust and the owner of Lassia.  Bankr. Dkt. No. 1472.  The Bankruptcy

Court determined that "with Mr. Hadjieleftheriadis in these roles," purported Provisional

Holdings "filed oppositions to both the Liberian and Greek proceedings initiated by reorganized

Eletson Holdings, seeking recognition of the confirmation order."  March 12 Oral Decision, at

67:16–21.  The Bankruptcy Court explained too that "even if the former majority shareholders

did not technically initiate foreign opposition proceedings, they are capable of and empowered to

influence or at least attempt to and disclose that, inter alia, the purported provisional board and/or the former minority shareholders regarding taking actions contrary to the foreign recognition proceedings." *Id.* at 71:16–21.[19]  The Former Majority Shareholders have set forth no basis on clear error review to upset the factual finding by the Bankruptcy Court that they were noncompliant.

Finally, the Bankruptcy Court did not abuse its discretion in finding that the Former Majority Shareholders have not "diligently attempted to comply in a reasonable manner." *In re Markus*, 78 F.4th at 566.  It is the burden of the Former Majority Shareholders to prove that compliance was not possible.  *See Armstrong v. Guccione*, 470 F.3d 89, 99 (2d Cir. 2006).  Here, not only did the parties not meet that burden; their own declarations demonstrate that they could have complied, or attempted compliance, but did not.  The certifications from each of the three former shareholders as to their duty to instruct the AOR reveal their lack of compliance.  Both Lassia and Family Unit Trust deferred to Hadjieleftheriadis, the "President of the provisional Board of Directors."  Bankr. Dkt. No. 1482-1, 1482-3.  For his part, Hadjieleftheriadis explained

---

[19] As to the Bankruptcy Court's findings that the actions of Hadjieleftheriadis and the Former Majority Shareholders could not be entirely distinguished in this context, the parties were not required to argue, nor did the Bankruptcy Court need to find, that the corporate veil of the Former Majority Shareholders was pierced.  *See Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 589–90 (S.D.N.Y. 2024).  Sanctions can be imposed on a third party when that party was the "major shareholder, chief executive, and only person affiliated with the defendant to have a substantive role in the litigation," or where the party "had aligned himself closely with Defendants in the litigation."  *International Technologies Marketing Inc. v. Cognyte Technologies Israel Ltd.*, 2022 WL 11280876, at *5 (S.D.N.Y. Oct. 19, 2022) (quoting *Amerisource Corp. v. Rx USA Int'l, Inc.*, 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010), *aff'd sub nom. N.Y. Credit & Fin. Mgmt. Grp.*, 432 F. App'x 25 (2d Cir. 2011) (summary order) and *Saravia v. Royal Guard Fence Co.*, 2020 WL 5231696, at *7 (E.D.N.Y. Sept. 2, 2020)).  The reverse is also true, as here the Bankruptcy Court explained that Hadjieleftheriadis was the owner of two of the three Former Majority Shareholders and represented their interests extensively through declarations before this Court and the Bankruptcy Court.  *See id.* at *8 (where a sanctioned party was a corporations "president," and "played a critical role in this litigation," sanctions upon him for conduct attributable to the corporation were appropriate).

only that he was "hesitant" to instruct the AOR to make the required changes given that lawyers

discomfort without protection from "a Greek Court."  Bankr. Dkt. No. 1482-2.  He did not

confirm that he instructed the AOR to make the required changes, but only that he "advised the

current AOR of the order."  *Id.*  That accords too with the fact that the Former Majority

Shareholders had earlier admitted that they *could* "instructed the current AOR to change the

AOR."  Bankr. Dkt. No. 1444 at 6 (the Objection of Majority Shareholders of Eletson Holdings

Inc. to Emergency Motino for Entry of a Further Order in Support of Confirmation).[20]  It is

undisputed that neither the opposition in the Liberian nor in the Greek proceeding were

withdrawn at the time sanctions were imposed.

The Former Majority Shareholders argue on appeal that they were and are unable to

control the conduct of third parties.  But that is a red herring.  The Bankruptcy Court imposed

sanctions on the shareholders for their *own* actions, not the actions of others, such as their failure

to even instruct the AOR to make the requisite updates, and their participation in the Liberian

and Greek proceedings.  *See* Bankr. Dkt. No. 1459 at 11 (explaining that in the Liberian

proceedings, the Former Majority Shareholders filed a response, a motion to dismiss, a motion to

intervene, and a motion to strike).  "There can be no question that courts have inherent power to

enforce compliance with their lawful orders through civil contempt."  *In re Markus*, 78 F.4th at

---

[20] The Former Majority Shareholders argue that the AOR was updated by the time the sanctions
order was entered and that the corporate documents on file with the LISCR were updated the
next day.  *See* No. 25-cv-2897, Dkt. No. 12 at 7.  The evidence in the Bankruptcy Court records
shows that it was Holdings itself, not the Former Majority Shareholders or any other related
party, that was ultimately successful in getting the LISCR to update Holdings' AOR to Adam
Spears on March 13, 2025.  Bankr. Dkt. No. 1555 at 1.  Indeed, the end to the Liberian
proceedings that the Former Majority Shareholders tout in their briefing was brought about only
because, without their participation or help, Holdings re-domiciled the company out of Liberia
and to the Marhsall Islands.  *Id.*  And the story does not end there—in response, on March 18,
2025, the Former Majority Shareholders (along with Provisional Holdings and Elafonissos
Shipping) filed *another* action in Liberia challenging the change of AOR.  *Id.*

564 (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)).  As this Court has already recognized, the order is binding on the Former Majority Shareholders, and they are required by the orders only to "effectuate that recognition" themselves, not to compel the conduct of third parties for whom they are not responsible.  *See Eletson*, 2025 WL 893686, at *13.

### C.    The Termination of the Liberian Action is Not a Basis for Reversing the Imposition of Sanctions

Finally, the Former Majority Shareholders argue that because the Liberian action that they joined opposing recognition of the Confirmation Order has since been terminated, the sanctions order of the Bankruptcy Court should be reversed.  That is contingent upon the truth of a proposition that is not before this Court, which is whether there have been any other suits filed in the intervening months that would run afoul of the March 13 Order.  Given the litigation in Athens, in which related parties have contested the recognition proceedings of Holdings, and in Germany, where they have sought to prevent the turnover of funds, that proposition is likely incorrect.  *See* Bankr. Dkt. No. 1721 at 70:1–8.

In any event, the argument is without merit.  The Bankruptcy Court imposed the sanctions of $5,000 per day "until such date the parties comply with the Plan, the Confirmation Order, the Consummation Order, and this Order."  March 13 Order at ¶ 3.  If, in the time since the sanctions were imposed, the Former Majority Shareholders have purged their contempt, they should notify the Bankruptcy Court of that fact and the fees will stop accruing.  It is "a hallmark of civil sanctions [is] that 'the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.'"  *CBS Broadcasting Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101 (2d Cir. 2016), (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994)).[21]

--------

[21] In their reply brief, the Former Majority Shareholders argue that because they have appealed

At base, the Former Majority Shareholders seek, via this appeal of the Bankruptcy Court's orders, to attack again with different arguments the Confirmation Plan affirmed by the Bankruptcy Court.  But "[i]f the former majority shareholders sought to contest the Plan, they should have done so through the bankruptcy proceeding and related appeals."  *Eletson Holdings Inc.*, 2025 WL 893686, at *11.  They did not have license to ask the Bankruptcy Court to reorganize Holdings and then simply to disobey the court's orders when they disliked how the company was reorganized.  The Bankruptcy Court's Orders are valid exercises of its power to enforce those prior orders.

## CONCLUSION

Holdings' motions to dismiss the appeals in Nos. 25-cv-1312, 25-cv-1685, and 25-cv-2824 are GRANTED.  The Former Majority Shareholders appeals in Nos. 25-cv-2897 and 25-cv-2811 are DISMISSED.

The Clerk of Court is respectfully directed to close Dkt. No. 5 in No. 25-cv-1312, Dkt. No. 7 in No. 25-cv-1685, and Dkt. No. 24 in No. 25-cv-2824.  Those appeals are dismissed.  The Clerk of Court is also respectfully directed to dismiss the appeals in 25-cv-2897 and 25-cv-2811.


SO ORDERED.

Dated: September 22, 2025
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

the sanctions order, the Bankruptcy Court cannot modify it.  *See In re Emerg. Beacon Corp.*, 58 B.R. 399, 402 (Bankr. S.D.N.Y. 1986).  But if the Former Majority Shareholders have purged their contempt, there is no need for the Bankruptcy Court to modify or eliminate its order—as explained, the sanctions fees stop accruing, by the terms of the order, upon compliance with the Plan.